Brennan, Circuit Judge.
Antoine Richmond entered a conditional plea of guilty to possessing a firearm as a felon. Before entering his plea, Richmond moved to suppress a handgun police seized from the threshold of his residence's front door during an encounter on his porch. The district court denied Richmond's motion, and he now appeals the court's ruling. We affirm the judgment of the district court.
I. BACKGROUND
A. The Search and Arrest
The night of October 11, 2016, Milwaukee Police Officers Chad Boyack and Anthony Milone were patrolling a residential neighborhood police refer to as the "Capitol Street Corridor." This area in Milwaukee is known for drug trafficking, armed robberies, and gun violence. Shortly before midnight, as they drove their marked squad car through an intersection, both officers saw Richmond walking toward them on a sidewalk. Richmond strode with his left hand free at his side and his right hand in the "kangaroo" pocket on the front of his T-shirt. Officer Milone saw "a significant bulge" from this pocket, and Officer Boyack described the bulge as a "medium-sized to larger object" protruding through Richmond's front pocket. In their experiences and training as police officers-almost 20 years for Boyack, and 6 years for Milone-front pocket bulges like this typically *409 concealed a firearm. They suspected the same here.
Richmond made eye contact with Boyack as the squad car approached. After the officers passed Richmond, he changed direction, quickened his pace, crossed the front lawn of a residential duplex, and moved toward the stairs up to its front porch. Unknown to the officers, Richmond was walking across the yard to get to the front door of a duplex where he lived.[1] Seeing the suspicious bulge in Richmond's front pocket and his unusual change of course prompted the officers to make a sharp U-turn and park in front of the duplex to talk with Richmond.
As the officers exited their squad car, Richmond walked up the porch's five stairs toward the front door. Boyack and Milone followed and, from about 20 to 25 feet away, they saw Richmond open the outer screen door with his left hand, bend down, and with his right hand place a dark, medium-sized object on the doorframe between the screen door and front door, which was closed. The front porch light illuminated Richmond's action, but the officers could not make out what Richmond placed on the threshold. Nor could they observe the stashed object as they approached, as the bottom third of the screen door was opaque. They suspected Richmond hid a gun. Their suspicions were based on their experiences on patrol, including with persons licensed to carry concealed weapons. To them, hiding a gun on the floor behind an unlocked screen door in response to approaching police was not typical of a concealed-carry license holder.
After Richmond placed the object on the doorframe, he closed the screen door and turned around as the officers walked up to the porch. Boyack asked Richmond if he had heard shots, if he was carrying a weapon, and what he was doing at the duplex. Richmond answered no to the first two questions, and replied that the house was his girlfriend's. While Boyack questioned Richmond, Milone walked up onto the porch toward the screen door, which put Richmond between the two officers.
While Boyack asked questions, Milone opened the screen door "as little as possible" and saw a black semi-automatic .40 caliber handgun resting where the officers observed Richmond place the dark, medium-sized object from his pocket. According to Milone, Richmond stood within the screen door's swing radius because he could open it only partially without hitting Richmond's back. After seeing the gun, Milone immediately used code to alert his partner of the presence of a firearm and possible arrest. Boyack then asked Richmond if he was a convicted felon. Richmond confirmed he was, so the officers arrested him. The entire encounter from when the officers first observed Richmond walking on the sidewalk to Milone seeing the gun and Richmond confirming he was a felon lasted no more than thirty seconds.
B. Evidentiary Hearings on Motion to Suppress
After being indicted for possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1), Richmond moved to suppress the gun, arguing Milone's act of opening the screen door constituted a warrantless search on the curtilage of his home without legal justification.
Two evidentiary hearings were held on Richmond's motion. After the first, a magistrate judge issued a report recommending the motion be denied for two reasons:
*410 the officers had reasonable suspicion to make an investigatory stop of Richmond, and the search behind the screen door was appropriate to ensure their safety. Richmond objected to the magistrate judge's report, and the district judge held a second hearing to personally evaluate the officers' testimony.
Boyack and Milone testified at both hearings and were sequestered during their examinations. Their accounts of the facts leading up to Richmond's arrest were consistent with each other and at each hearing, except before the district judge in one respect: where Richmond stood on the porch when Milone opened the screen door. Boyak testified Richmond, after placing the gun in the doorframe, stepped away from the door and walked down to the second step of the porch. Milone said everyone remained on the top landing of the porch, and Richmond remained close to the screen door.
Although Boyack and Milone gave differing accounts of Richmond's specific location on the porch, the officers each stated Richmond could access what they had suspected was a gun. The officers also testified Richmond was calm throughout their interaction. Even still, the officers each feared that Richmond could bolt toward the door to arm himself, as the officers have experienced in the past with other suspects. Richmond's large stature heightened the officers' concern. Boyack testified Richmond was a "very well-built, muscular" man, and at the hearing the district court verified the accuracy of this description. The officers were similarly concerned about unknown duplex occupants because a potentially loaded gun lay exposed in the doorway, posing a danger to anyone outside or inside the house.
C. Order Denying Suppression
After the second evidentiary hearing, the district court adopted the magistrate judge's recommendation and denied Richmond's motion to suppress. The court concluded that the combination of facts described above gave the officers reasonable suspicion that Richmond was doing something unlawful as he walked down the street and headed toward the porch.
Also, based on these facts, the district court ruled the officers performed a lawful protective search under Terry v.Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The court relied on Richmond's exhibits to confirm the porch was narrow, so regardless of whether Richmond remained near the door (per Milone) or moved onto the porch steps (per Boyack), Richmond stood unrestrained within a stride or two of the gun and could have armed himself quickly had he so chosen. Last, the district court noted Terry searches are not restricted to the suspect's person, and ruled that Milone's search was justified as narrowly confined to the only place from which the officers had reason to believe Richmond could obtain a weapon.
II. DISCUSSION
When considering a district court's denial of a motion to suppress, we review its legal conclusions de novo and its findings of fact for clear error. United States v. Howard , 883 F.3d 703, 706-07 (7th Cir. 2018). We give due weight, as we must, to a trial court's assessment of the officers' credibility and the reasonableness of their inferences. Ornelas v. United States , 517U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (requiring reviewing courts to review findings of historical fact only for clear error and give due weight to factual inferences drawn by resident judges and local law enforcement officers); Howard , 883 F.3d at 707 (holding the same). "Because the resolution of a motion to suppress is a fact-specific inquiry, *411 we give deference to credibility determinations of the district court, who had the opportunity to listen to testimony and observe the witnesses at the suppression hearing." United States v. Groves , 530 F.3d 506, 510 (7th Cir. 2008) (internal quotations omitted).
We examine first whether the officers reasonably suspected that Richmond was engaged in criminal activity, and second whether Milone's search behind the screen door eclipsed a constitutional boundary.
A. Reasonable Suspicion of Unlawful Activity
A limited intrusion into an individual's privacy is permitted under the Fourth Amendment where the police have reasonable suspicion to believe criminal activity is afoot. See Terry , 392 U.S. at 30, 88 S.Ct. 1868 ; United States v. Baskin , 401 F.3d 788, 791 (7th Cir. 2005). Reasonable suspicion exists when an officer can point to " 'specific and articulable facts which, taken together with rational inferences from those facts[,] reasonably warrant that intrusion.' " Baskin , 401 F.3d at 791 (quoting Terry , 392 U.S. at 21, 88 S.Ct. 1868 ).
When making reasonable suspicion determinations, we "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu , 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (internal quotations omitted). Reasonable suspicion requires more than a hunch but less than probable cause and "considerably less than preponderance of the evidence." Illinois v. Wardlow , 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).
With these standards in mind, we examine the facts on which the officers formed their suspicions, and whether the district court erred in its reasonableness assessment.
Four categories of facts created a suspicion that Richmond was illegally carrying a gun or was otherwise engaged in unlawful activity: (1) Richmond was walking down the street near midnight in a neighborhood plagued by drug trafficking and gun violence; (2) there was a significant bulge in Richmond's front T-shirt pocket as he walked down the street; (3) in the officers' over 25 combined years' of police training and experiences, a protrusion like this was more often than not a gun; and (4) after the officers passed Richmond in their marked squad car, Richmond quickened his pace, changed his direction, cut across a property, and hid what they suspected was a gun between the screen door and front door.
Richmond contends none of the factors articulated by the officers at the suppression hearings, standing alone, are illegal conduct. He emphasizes he was walking home and, after seeing the officers, continued on that path to his residence. Richmond insists that, as far as the officers knew, he may have been licensed to carry a concealed firearm. See WIS. STAT.§ 175.60 (permitting persons age 21 and older who have not been convicted of a felony to obtain a concealed-carry license).
Richmond's points miss the forest for the trees: when evaluating the reasonableness of a police intrusion, we look at the totality of circumstances and "must not be overly focused on any one factor." United States v. Swift , 220 F.3d 502, 506 (7th Cir. 2000).
Richmond's presence in a neighborhood beset by drug trafficking and gun violence does not, by itself, support a particularized suspicion that he was committing a crime. But it is among the relevant contextual considerations in a reasonable *412 suspicion analysis. See, e.g. , Wardlow , 528 U.S. at 124-125, 120 S.Ct. 673 (concluding defendant's evasive behavior in a high crime area and unprovoked flight after seeing the police had aroused a reasonable suspicion that he was engaged in criminal activity); United States v. Jackson , 300 F.3d 740, 746 (7th Cir. 2002) (holding same). A suspect's evasive behavior, and the experience of the officers, are also relevant factors. United States v. Oglesby , 597 F.3d 891, 894 (7th Cir. 2010) (evasive behavior); Jackson , 300 F.3d at 746 (officer experience).
That Richmond changed his direction to head home does not alter the analysis. The officers did not know he lived at the duplex when they pulled over and approached him on the porch. And both officers testified he was not acting the way someone with a concealed-carry license would act on their own property. "[B]ehavior which is susceptible to an innocent explanation when isolated from its context may still give rise to reasonable suspicion when considered in light of all of the factors at play." Baskin , 401 F.3d at 793. Richmond's innocent explanations-including a hypothetical concealed-carry license-do not discharge all other relevant facts from consideration. Richmond argues this is new territory, as the Supreme Court has yet to directly address the constitutionality of a Terry stop within a home's curtilage. He cites Ninth, Tenth, and Eleventh Circuit cases to argue Terry does not justify a stop, seizure, or search inside the home. But none of these cases concern a protective search for weapons by officers lawfully within the curtilage of a home.[2]
On this topic, this court has allowed a Terry stop in a structure attendant to a house. In United States v. Pace , 898 F.2d 1218, 1223 (7th Cir. 1990), we applied Terry to uphold the stop of a defendant in his condominium garage, supported by reasonable suspicion alone. There, the officer was pursuing the defendant, whom the officer suspected might be a mob assassin on his way to kill another condominium resident. Pace , 898 F.2d at 1229. Upon discovering he was being followed, the defendant took what the officer considered to be evasive action. Id . When the defendant entered the garage, the officer had to decide whether to pursue him to investigate his suspicion or to let him go despite the threat he might have posed to another resident. Id . We balanced the potential for harm against the intrusion on the defendant's privacy and held both the officer's suspicion *413 and entry were reasonable. Id . (citing Terry , 392 U.S. at 21-22, 88 S.Ct. 1868 and Michigan v. Long , 463 U.S. 1032, 1046, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) ).
Like the police in Pace , Boyack and Milone articulated objectively reasonable grounds to suspect Richmond was engaged in criminal activity that justified their entry onto the porch. Richmond describes the facts differently. But "[t]he need to resolve ambiguous factual situations-ambiguous because the observed conduct could be either lawful or unlawful-is a core reason the Constitution permits investigative stops." United States v. Miranda-Sotolongo , 827 F.3d 663, 669 (7th Cir. 2016). Because the aggregate facts support a particularized and objective basis for the officers to suspect Richmond was engaged in criminal activity, their suspicions were reasonable within the meaning of the Fourth Amendment.
The sum of all the information known to officers at the time of the stop is considered, including the behavior and characteristics of the suspect. Matz v. Klotka , 769 F.3d 517, 523 (7th Cir. 2014). Here, that information included specific and articulable facts which taken together fostered Boyack's and Milone's reasonable suspicion that "criminal activity is afoot."
B. The Search
We next address whether Milone exceeded the permissible scope of Terry when he partially opened the screen door to search for a gun.
Richmond depicts his exchange with the officers as a "consensual encounter," not an investigatory stop.[3] In so doing, he acknowledges the officers were permitted to enter onto the porch area to ask him questions to dispel their suspicions, but contends a warrant or his consent was required to open the screen door. From this he argues there is no specific exception for a "search incident to a Terry stop."
Even so, the Supreme Court upheld the search in Terry (a protective frisk) without determining whether an investigatory stop took place before the search. See United States v. Mendenhall , 446 U.S. 544, 552, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (explaining same). We follow Terry 's approach. For purposes of our review, it matters not whether a Terry stop preceded Milone's search.
Now we turn to Richmond's contention that Milone's search behind the screen door infringed upon established Fourth Amendment principles.
1. Terry and later case law permit limited area searches for weapons .
The Fourth Amendment guarantees the right of the people to be secure in their houses against "unreasonable" police searches. U.S. CONST.amend IV. Curtilage-the "area immediately surrounding and associated with the home"-is entitled to the same Fourth Amendment protection as the home itself. Florida v. Jardines , 569 U.S. 1, 7, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013) (describing the front porch as the "classic exemplar" of constitutionally protected curtilage).
For protective searches for weapons, the Supreme Court has held that area searches are permissible in limited *414 circumstances: "[O]fficers who conduct area searches during investigative detentions must do so only when they have the level of suspicion identified in Terry ." Long , 463 U.S. at 1050 n.14, 103 S.Ct. 3469 (concluding officers did not act unreasonably in taking preventive measures to ensure there were no weapons within defendant's immediate grasp before permitting him to reenter his automobile). Area searches are allowed "in the Terry context" because "the arrestee, who may not himself be armed, may be able to gain access to weapons to injure officers or others nearby, or otherwise to hinder legitimate police activity." Id . All the same, the search remains a serious intrusion so it "must 'be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs or other hidden instruments for the assault of the police officer.' " Jackson , 300 F.3d at 746 (quoting Terry , 392 U.S. at 29, 88 S.Ct. 1868 ); see also Minnesota v. Dickerson , 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (holding a Terry search "must be strictly limited to that which is necessary for the discovery of weapons"). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence ...." Adams v. Williams , 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).
We have similarly held that, under Terry , an officer may conduct a protective search for weapons of an individual's person, "and area within his control," if " 'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.' " Cady v. Sheahan , 467 F.3d 1057, 1061-62 (7th Cir. 2006) (quoting Terry , 392 U.S. at 27, 88 S.Ct. 1868 ). A protective search for weapons "is a vital tool to serve the 'immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.' " Id . at 1061 (quoting Terry , 392 U.S. at 23, 88 S.Ct. 1868 ).
Richmond points to various decisions involving impermissible searches which he contends mandate reversal. First, he invokes Florida v. Jardines , in which the Supreme Court assessed the permissibility of a police search on a front porch. 569 U.S. at 3-5, 133 S.Ct. 1409. In that case, officers without a warrant or probable cause walked up to the front door of a residence and used a drug-sniffing dog to investigate an unverified tip that marijuana was being grown in the home. Id . at 3-4, 133 S.Ct. 1409. The Court acknowledged an implied license exists for members of the public to approach a home and knock on the front door based upon custom and social norms. Id . at 10-11, 133 S.Ct. 1409. But the warrantless use of sensory-extending drug dogs to discover incriminating evidence inside the home exceeds this customary invitation and constitutes a trespassory search implicating the Fourth Amendment. Id . at 10-12, 133 S.Ct. 1409 (affirming Florida Supreme Court's holding that canine sniff of front door was a search requiring a warrant).
Richmond also cites Collins v. Virginia , which questioned whether the automobile search exception justifies an invasion of curtilage. --- U.S. ----, 138 S. Ct. 1663, 1671, 201 L.Ed.2d 9 (2018). In Collins , the officer discovered photographs on social media of a potentially stolen motorcycle parked at the top of the driveway of a house. The officer tracked down the address of the home, drove to it, walked up the driveway to investigate, and pulled a tarp off the motorcycle to search its license plate and vehicle identification numbers, which confirmed that the motorcycle was stolen. Id . at 1668. The Court held that the *415 automobile exception-which is based largely upon the ready mobility of the vehicle-"extends no further than the automobile itself[,]" and does not give "an officer the right to enter a home or its curtilage to access a vehicle without a warrant." Id . at 1671.
Like the officers in Jardines and Collins , Boyack and Milone performed a search within the curtilage of the house in which Richmond resided. But there are critical distinctions between the circumstances governing the officers' conduct here and the conduct proscribed by the Supreme Court in those cases. First, and most importantly, no imminent safety threat existed in either Jardines or Collins . There, the searches were performed while the suspect was absent and the officers did not articulate any threat of danger during their searches. Neither of the officers in those cases made split-second decisions, nor did they invoke Terry (or any of Terry's underlying principles) to justify their investigations or searches.
Second, the objects searched for in Jardines and Collins were drugs and stolen property, not weapons. In Jardines , the search implicated the actual interior of the home. Here, unlike Jardines and Collins , at the moment of the search the officers had no indication Richmond had any Fourth Amendment interest in the home. Third, Milone and Boyack's conduct throughout their investigation remained anchored to the Terry -exception's safety justifications. Cf . Collins , 138 S. Ct. at 1672 ("[R]ely[ing] on the automobile exception to gain entry into a house or its curtilage for the purpose of conducting a vehicle search would unmoor the exception from its justifications."). That conduct is not unfettered "trawl[ing] for evidence." Cf. Jardines , 569 U.S. at 6, 133 S.Ct. 1409.
Richmond also cites our decision in United States v. Leo , where we rejected officer safety as a justification for a search into a backpack containing a gun. 792 F.3d at 749-51. In that case, officers responded to a 911 call that two men committed a burglary. When the officers arrived, they saw two men walking toward a preschool. The officers stopped the men and handcuffed their hands behind their backs. An officer then took the defendant's backpack, placed it out of the defendant's reach, emptied it, and found a gun. Id . at 744-45.
Leo does not help Richmond. In Leo , we held the backpack search was not supported by reasonable suspicion because the defendant could not get "immediate control" of a gun-while handcuffed-outside his reach. Id . at 750. Here, when Milone opened the screen door, Richmond was unrestrained, the district court found he "could have armed himself quickly," and, unlike the prima facie privacy expectations of a person carrying a backpack, it was unknown whether Richmond had any privacy interest in the duplex porch.
Put succinctly, Jardines , Collins , and Leo do not concern protective searches to neutralize the threat of a weapon in a suspect's immediate area of control. Cf . Long , 463 U.S. at 1049-50, 103 S.Ct. 3469 (neutralizing threat in suspect's car passenger compartment); Cady , 467 F.3d at 1062 (neutralizing threat in suspect's briefcase). In contrast, Long and Cady applied the reasoning in Terry and its offspring and upheld the protective searches evaluated in those cases. See Long , 463 U.S. at 1050 n.14, 103 S.Ct. 3469 ; Cady , 467 F.3d at 1062. We do the same here. See Terry , 392 U.S. at 24, 26, 88 S.Ct. 1868 ; see also Dickerson , 508 U.S. at 373, 113 S.Ct. 2130. In sum, police may conduct an area search strictly limited to that which is necessary for the discovery of weapons if the officer has a reasonable and articulable suspicion that the subject whose suspicious behavior he is investigating *416 at close range may be able to gain access to a weapon to harm the officers or others nearby.
2. Reasonable suspicion is required to conduct a search.
Like all Terry searches, Milone's search must be supported by reasonable suspicion. To assess whether reasonable suspicion existed here, we look again to the totality of circumstances known to Boyack and Milone at the time the search occurred. United States v. Tinnie , 629 F.3d 749, 751-52 (7th Cir. 2011). We also balance the need to search against the intrusion which the search entails. Terry, 392 U.S. at 21, 88 S.Ct. 1868 ; see also Marylandv. Buie , 494 U.S. 325, 335-36, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) ; Pace , 898 F.2d at 1229 (upholding Terry stop on curtilage).
Terry contemplates searches to screen persons who may be "armed and presently dangerous." Terry , 392 U.S. at 30, 88 S.Ct. 1868. In so determining, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id . at 27, 88 S.Ct. 1868 ; Cady , 467 F.3d at 1061-62 (holding same). Here, the circumstances prompting the officers' suspicions that Richmond was engaged in criminal activity also roused their suspicions he might be armed and dangerous; indeed, the officers suspected Richmond had placed a gun on the threshold of the front door behind the screen door.
Richmond argues his close proximity to a gun does not, by itself, give rise to a reasonable suspicion he was dangerous. He also contends the officers could not reasonably have been alarmed at any point during the encounter because he maintained a calm and cooperative demeanor, he did not run away from the officers, he stepped away from the door where the gun was located, he did not insist on going into his home but stayed and spoke with officers, and Milone stood between him and the suspected gun, impeding Richmond's access to it.
But Richmond's arguments focus on whether the officers subjectively believed he was dangerous. Reasonable suspicion is measured against the totality of the circumstances, an objective test. United States v. Adamson , 441 F.3d 513, 521 (7th Cir. 2006) ; see also Brigham City, Utah v. Stuart , 547 U.S. 398, 404, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (explaining an officer's subjective motivation to intrude within a home "is irrelevant" under the Fourth Amendment; what matters is whether "the circumstances, viewed objectively , justify the action.") (emphasis in original, internal brackets omitted).
In determining whether a suspect is "presently dangerous," "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry , 392 U.S. at 27, 88 S.Ct. 1868 ; Cady , 467 F.3d at 1061-62 (holding same). "More importantly ... the fact-specific inquiry into the existence of reasonable suspicion must be undertaken with due regard to common sense and practicality." Adamson , 441 F.3d at 521.
Here, Boyack and Milone faced two obvious risks: Richmond might lunge toward what they suspected was a gun, and unknown duplex occupants might access the gun by opening the front door and picking it up off the threshold. The district court found the officers' testimony credible; specifically, the porch was narrow, Richmond was within the immediate vicinity of a gun, *417 the officers did not know who owned the property, and Richmond was large, muscular, and unrestrained. The officers testified Richmond cooperated at that moment, but they also were concerned he might quickly change his mind, physically overwhelm them, and charge for the gun. And Richmond's cooperation did not eliminate the possibility that someone from inside the house could obtain the weapon to use against them, which they also feared.
That Milone and Boyack testified differently as to Richmond's exact location on the porch does not change our analysis. Milone testified Richmond was within the swing radius of the screen door. Boyack placed Richmond a few steps from the screen door. If the latter, there could be a fractional delay in Richmond's ability to access the gun and use it against them. Richmond's own evidence about the width of the porch supports this finding, and the district court relied on that evidence to conclude Richmond was one or two strides from the gun.
That the officers could have asked or directed Richmond to step away from the front door for a conversation does not alter our assessment. As an initial matter, police officers are not required to take unnecessary risks in the performance of their duties. See Terry , 392 U.S. at 23, 88 S.Ct. 1868. Officers must make quick decisions in the field, so we judge from the perspective of a reasonably prudent person in the circumstances before us, not 20/20 hindsight. See id. at 27, 88 S.Ct. 1868 ; Cady , 467 F.3d at 1061-62. Even if we second-guess, had the officers moved Richmond further away from the gun, anyone in the house would still have had ready access to the firearm.
Milone's on-the-spot response is not rendered unreasonable because Richmond was cooperative in the present moment. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving." Kentucky v. King , 563 U.S. 452, 466, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) (citations and internal quotations omitted). The entire encounter here lasted no longer than half a minute, which called for "necessarily swift action predicated upon the on-the-spot observations of the officer[s] on the beat." Long , 463 U.S. at 1047 n.11, 103 S.Ct. 3469. The only information the officers knew during the search was that a suspected gun located between the screen door and front door was accessible to Richmond and to duplex occupants. Milone's corresponding search lasted no longer than necessary to verify the reasonable suspicion of danger, and that search was limited to the only place where the firearm could be accessed.
Based on the totality of these circumstances, Boyack and Milone were objectively and reasonably concerned with their safety, so the balancing required by Terry weighs in favor of Milone's minimally intrusive search in which he found the gun. Opening the screen door thus fell within the bounds of a constitutional search.
3. Deference is owed to reasonable factual inferences.
"[T]he Supreme Court [in Ornelas ] deliberately chose a formulation that allows the court of appeals to give deference where that is due, but to reject deference where its independent review suggests it is not due." United States v. Sholola , 124 F.3d 803, 822 (7th Cir. 1997) (Wood, C.J., concurring) (citing Ornelas , 517 U.S. at 699-700, 116 S.Ct. 1657 ). In either case, our determination "must be based on commonsense judgments and inferences about human behavior." Wardlow , 528 U.S. at 125, 120 S.Ct. 673. To *418 demand more of the district court, or Boyack and Milone, under the circumstances of this case would be an unreasonable demand for certainty where none exists. See id. at 124-125, 120 S.Ct. 673.
The facts articulated by Boyack and Milone prompt a reasonable inference that Richmond was illegally carrying a gun. Richmond's activity was also consistent with hiding a gun, which the officers suspected and subsequently confirmed. The officers searched only for a gun and found only a gun. They did not search for a gun until after seeing Richmond hide a suspected gun, underscoring the non-speculative and non-pretextual nature of their search. Nor was the search here unreasonably invasive. Opening the screen door provided no information about the interior of the house, the officers did not search Richmond's person, nor did they search any other areas of the porch or exterior of the duplex. The degree of intrusion on Richmond's privacy was as reasonable and minimal as common sense dictated in that moment based upon what the officers had seen and what they knew.
The officers also acted on a commonsense inference that Richmond did not have a license to carry a concealed weapon. Both officers testified they had encountered individuals who possess firearms legally with a concealed-carry license. But those individuals never acted in the way Richmond did by trying to hide the gun on a door sill. To the officers, the likelihood Richmond had a license to carry a concealed weapon was diminished when he stashed the object resembling a gun on the ground, behind a screen door, where it was accessible to others. This is suspicious (and dangerous) behavior for any lawful gun owner, let alone concealed-carry license holders. See Adams , 407 U.S. at 146, 92 S.Ct. 1921 (noting a limited search "might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law").
Based upon our independent review of the facts and inferences before us, and giving due weight to the district court's credibility determinations, we see no reason to disturb the court's findings. Milone's search was an objectively reasonable police response to a reasonable suspicion of danger.
4. The principles of Terry and its later case law supported the officers' search.
Terry legitimated protective searches for weapons under the Fourth Amendment, and the Supreme Court has since emphasized the importance of standards necessary to secure police safety. Maryland v. Buie , 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) is instructive here, as the Supreme Court applied the principles of Terry (upholding stop and frisk of a person) and Long (upholding roadside search of automobile passenger compartment) and upheld protective police sweeps incident to arrests: "In Terry and Long we were concerned with the immediate interest of the police officers in taking steps to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them." Buie , 494 U.S. at 333, 110 S.Ct. 1093. Neither Terry nor Long involved protective sweeps incident to arrest, yet the Supreme Court held that the principles they applied in Terry and Long applied in Buie . Id at 333-34, 110 S.Ct. 1093.
Each of these cases evaluated the dangerousness of the police confrontations and, as we do here, balanced the interests of officer safety, effective law enforcement, and individual rights. See id . ("The ingredients to apply the balance struck in Terry *419 and Long are present in this case."). We see no difference between the safety concerns which justified the searches in Buie , Terry , or Long , and those articulated by Boyack and Milone. Both officers had an immediate interest in assuring themselves that neither Richmond nor someone inside the duplex could gain immediate control of a gun and use it against them.
This decision would differ if Richmond's gun was located behind the closed front door. A Terry -search like this must be limited to a weapon, in areas where a weapon may be concealed, and only when police have a reasonable and articulable suspicion that a suspect poses a danger from the presence of a weapon within a suspect's immediate access or control.
III. CONCLUSION
Given the totality of the circumstances, the officers' suspicions were reasonable that Richmond was illegally carrying a gun. Because Richmond (or someone else) had ready access to the gun, officer Milone acted reasonably to extinguish a patent safety threat when he performed a brief search limited exclusively to the area where both officers saw the object, later confirmed to be a gun, was placed.
For these reasons, we AFFIRM.

Richmond's girlfriend resided at the duplex, and Richmond had been living there for about one month before his arrest.

Richmond cites Moore v. Pederson , 806 F.3d 1036, 1044-46 (11th Cir. 2015) (involving the warrantless seizure of a suspect inside his home); United States v. Perea-Rey , 680 F.3d 1179, 1188-89 (9th Cir. 2012) (holding a border patrol agent intruded into an area of curtilage where uninvited visitors would not be expected to appear to stop an individual suspected of entering the country illegally); United States v. Struckman , 603 F.3d 731, 743 (9th Cir. 2010) (holding the warrantless entry by two officers into a fully enclosed backyard-one officer kicking open a padlocked gate and the other scaling a fence-was not supported by probable cause, Terry , or exigent circumstances); and United States v. Reeves , 524 F.3d 1161, 1167-69 (10th Cir. 2008) (involving the warrantless seizure of a suspect inside his motel room and construing the encounter as occurring within the home). Perea-Rey and Struckman proscribed police entries without consent into cordoned areas of curtilage. But Richmond acknowledges that Boyack and Milone were permitted to enter onto the porch even without his consent, Brief of Appellant at 7, 15, unlike the closed off areas in Perea-Rey and Struckman . He also acknowledges that he consented to the officers' presence on the porch. Brief of Appellant at 7, 16-17, 19. Reeves and Moore addressed the warrantless seizures of suspects inside their homes without probable cause, exigent circumstances, or consent. Richmond does not contest his seizure on appeal, nor did any police activity occur inside his girlfriend's house.

Before the district court, Richmond claimed the officers conducted an investigatory stop that was not supported by reasonable suspicion. Reply in Support of Motion to Suppress at 2, 4, United States v. Richmond, No. 16-CR-197 (E.D. Wis. Mar. 13, 2017), ECF No. 23. On appeal, he now describes the officers' entry on the porch as consensual. Brief of Appellant at 7, 16-17, 19.