In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-2128

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KYLE C. OLSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 20-cr-75-1 — **William M. Conley**, *Judge.*

ARGUED FEBRUARY 17, 2022 — DECIDED JULY 18, 2022

Before ROVNER, HAMILTON, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Kyle Olson arrived in Madison, Wisconsin in the midst of the second night of violent civil unrest following the death of George Floyd and armed himself with a gun. Little did he know, three officers of the Madison Police Department observed Olson take the gun from the trunk of his car. In short order, the officers apprehended Olson, who turned out to be a felon, retrieved the gun, and placed him under arrest. Olson attempted unsuccessfully to suppress the

gun and now appeals the district court's denial of his suppression motion. We affirm.

## I. Background

### A. The George Floyd Protests

Like many major American cities, Madison, Wisconsin was embroiled in violent and disruptive protests during the weekend of May 30–31, 2020, in the wake of George Floyd's death. In Madison, crowds of hundreds engaged in rampant looting, vandalism, arson, and widespread violence. This chaotic situation was dangerous for civilians and law enforcement alike. Some protestors wore body armor and gas masks and armed themselves with weapons, including guns. Members of the Madison Police Department ("MPD") were a particular target of some of the protestors. Protestors verbally threatened MPD officers with injury and death and hurled projectiles, injuring several officers. Over the course of the weekend, protestors torched a marked MPD squad car after stealing an AR-15 rifle from inside. In an attempt to restore order, Satya Rhodes-Conway, Mayor of Madison, declared a state of emergency on May 30, 2020, and imposed a city-wide curfew.[1] MPD officers were impressed into near 24-hour service.

Officers Christopher Marzullo, Daniel Hamilton, and Manuel Gatdula were on duty the evening of May 31, 2020.

---

[1] PROCLAMATION OF EMERGENCY, May 30, 2020, *available at* https://www.cityofmadison.com/sites/default/files/news/attachments/emergency_order.pdf (last accessed Jul. 6, 2022); *see also id.* at 1, § 6.a ("A curfew is hereby imposed at the following times: i. May 31, 2020, at 12:01 a.m. until May 31, 2020, at 5:00 a.m. [and] ii. May 31, 2020, at 9:30 p.m. until June 1, 2020, at 5:00 a.m.").

Marzullo was a 7-year veteran of the force while Hamilton and Gatdula were 13-year veterans. Around 11:00 p.m., the three officers were on the second floor of the Wisconsin Lutheran Chapel and Student Center which served as a law enforcement resupply and stand-down area. A group of MPD officers had recently left the chapel to render aid to a nearby officer who had been assaulted by the crowd. It was at this point, while overlooking the street below from the chapel's large, second-story window, that Marzullo, Hamilton, and Gatdula first saw Appellant Kyle Olson.[2]

Olson parked a car directly across from the chapel. He was drinking an unknown liquid, which Hamilton believed could be alcohol, from a "tallboy" aluminum can and looking around at his surroundings. Both Hamilton and Gatdula considered this behavior unusual under the circumstances. Hamilton noted Olson appeared to be "checking a full 360" and scanning his environment to ensure he was not followed or observed by law enforcement. Gatdula also interpreted Olson's behavior as designed to determine whether he was being watched. Given the unrest, Gatdula believed Olson was preparing to engage in activity he did not want seen or discovered. All three officers then watched Olson take a black pistol from the trunk of the car, tuck the gun into his waistband at the small of his back, and pull his shirt over the gun. The officers decided to confront Olson. Marzullo radioed the

---

[2] Accounts of the interaction—specifically, the sequence of several key events—vary to some degree and form the basis of this appeal. Presently, unless otherwise noted, we describe those uncontested aspects of the encounter, those documented in the officers' recorded radio transmissions to the MPD command post, and their written reports from that evening.

MPD command post that they were "going to deal with a gentleman that possibly has a [gun] outside the church."

Marzullo, Hamilton, and Gatdula exited the chapel and approached Olson with their service weapons drawn and trained on him. Marzullo ordered Olson to place his hands on the top of the car, and Olson immediately complied. Marzullo and Hamilton secured Olson's hands while Gatdula proceeded to pat down Olson's back. Gatdula felt what he believed to be the grip of a pistol at the small of Olson's back, lifted Olson's shirt, and pulled a black pistol from Olson's waistband. Gatdula then walked approximately 10 feet away to a sidewalk to inspect the gun, which was fully loaded with a round in the chamber. At some point during this sequence of events, Hamilton radioed the MPD command post "[gun] secure. One at gunpoint." Approximately 40 seconds elapsed between Marzullo's initial call to the MPD command post regarding the officers' intent to approach Olson and Hamilton's call that the gun was secure.

Marzullo and Hamilton handcuffed Olson and Hamilton radioed the MPD command post they had "[o]ne [arrest] in front of the church." Twenty-four seconds elapsed between Hamilton's call to the MPD command post that the gun was secured and his call that the officers made an arrest. Marzullo searched Olson incident to arrest and discovered drug paraphernalia. During this search, Marzullo reported Olson "ma[de] an excited utterance stating that he was a felon."

While the officers took Olson into custody, they drew attention from an increasingly hostile crowd. Several people passed the officers yelling "fuck 12" and "let him go," presumably referring to Olson. Several large crowds of up to 100 people continued to gather and approach the officers'

position from a block away. Hamilton believed the approaching crowds were responsible for setting several fires that night and damaging property, including with a baseball bat. For everyone's safety, Marzullo and Hamilton moved Olson out of the street to a nearby front porch where Marzullo radioed for assistance transporting Olson to the Dane County Jail. While awaiting transportation, Hamilton reported Olson confessed he was a convicted felon. All three officers filed written reports documenting their interaction with Olson in the early hours of June 1, 2020.

**B. Motion to Suppress the Gun**

The government charged Olson with one count of possession of a gun as a felon, in violation of 18 U.S.C. § 922(g)(1). Olson moved to suppress the gun as fruit of an illegal search shortly thereafter. Olson argued his encounter with the officers was either an arrest from its inception unsupported by probable cause or an unconstitutional *Terry* stop unsupported by reasonable suspicion.

The magistrate judge held a suppression hearing where, in addition to reviewing the officers' incident reports and the radio transmissions from the night in question, he took live testimony from Marzullo, Hamilton, and Gatdula. Although their testimony largely aligned with their reports, the officers' accounts at the suppression hearing expanded upon or diverged in a few key respects. All three officers testified they decided to confront Olson after seeing him place a gun in the waistband at the small of his back to confirm he was lawfully carrying. While holders of concealed carry weapon ("CCW") permits are permitted to concealed carry in Wisconsin, those without such permits are not. Gatdula testified that, in his

professional experience, CCW holders do not place guns in the waistband at the small of their backs.

Given the proximate, ongoing civil unrest, the officers viewed their interaction with Olson as a high-risk encounter. The officers testified they feared Olson, who they suspected was armed with a gun, presented a danger both to officers and the public. The officers cited assaults on MPD officers and destruction of MPD property, threats of further violence, the recent theft of a rifle from a marked squad car, and large groups of protestors nearby. Marzullo in particular was concerned Olson might follow the group of MPD officers who recently left the chapel to assist an officer in distress. All three officers emphasized the rapid succession of events and lack of time to make decisions. Consequently, the officers testified it was necessary to approach Olson with their guns drawn and place him in handcuffs prior to his arrest.

Where the officers' testimony departs from their written reports is in their account of when, and how many times, Olson admitted to being a felon. Marzullo and Hamilton testified Olson said he was a felon shortly after Gatdula retrieved the gun from his waistband but before they placed Olson under arrest. Marzullo stated his written report was incorrect and should have indicated Olson admitted to being a felon before his arrest. Hamilton testified it was Olson's identification of himself as a felon that triggered the arrest. Gatdula testified Marzullo came up to him while he was inspecting the gun and told him Olson said he was a felon. Hamilton testified Olson made a second spontaneous admission as to his status as a felon after he was arrested while awaiting the arrest team on the nearby porch. When pressed why their written reports did not reflect this sequence of events, all three

officers pointed to the unusual degree of stress and sleep dep-
rivation they experienced that weekend. All three officers tes-
tified they did not review their reports until shortly before the
suppression hearing.

The magistrate judge recommended denying Olson's sup-
pression motion. First, the officers' use of force did not ripen
the initial stop to an arrest. The magistrate judge determined
Olson and his gun presented an "immediate, palpable dan-
ger" to officers and civilians. Second, the officers had reason-
able suspicion to initiate an investigatory stop. The magistrate
judge credited Hamilton and Gatdula's description of Olson's
extensive visual survey of his surroundings as "countersur-
veillance" suggesting he wished to evade notice. The magis-
trate judge also cited the officers' professional experience that
CCW holders do not typically carry their guns in the waist-
band at the small of their back. Combined with the "mael-
strom of violence and danger" of the night in question, the
officers reasonably suspected from the totality of the circum-
stances Olson was engaged in criminal activity. Third, the
magistrate judge found Olson admitted to being a felon twice:
once before his arrest and once after. The magistrate judge
acknowledged Olson identified a legitimate question regard-
ing the discrepancy between Marzullo's written report and
his testimony, a difference which flipped a material fact in fa-
vor of the government. Nevertheless, based on the written re-
ports, the radio transmissions, and the testimony and de-
meanor of the witnesses, the magistrate judge credited the se-
quence of events described during the suppression hearing.
Fourth and finally, the magistrate judge noted the good faith
doctrine applied even if the officers constitutionally erred.

Olson objected to the magistrate judge's report and recommendation. Two of his objections are relevant on appeal. Olson challenged the magistrate judge's factual determination as to the timing and number of his admissions regarding being a felon. Olson also revived his claim that the officers' use of force immediately ripened the stop to an arrest.

The district court accepted the magistrate judge's report and recommendation, accepting the factual findings and incorporating them as its own. Citing the unusual circumstances and safety concerns on the night in question, the district court agreed the encounter between officers and Olson did not amount to an immediate arrest. The district court also determined the officers had reasonable suspicion to believe Olson was carrying a gun unlawfully, justifying an investigatory stop. Finally, giving deference to the magistrate judge's credibility determinations based on taking live testimony at the hearing, the district court declined to disturb the factual finding Olson told officers he was a felon before his arrest. The district court agreed other evidence (specifically the radio transmissions and Gatdula and Hamilton's testimony) corroborated Marzullo's testimony as to the sequence of events. Olson now appeals the district court's denial of his suppression motion.

## II. Discussion

Olson challenges four aspects of the district court's order dismissing his motion to suppress the gun. First, Olson argues the officers' use of force rendered his seizure a de facto arrest unsupported by probable cause from its inception. Second, and alternatively, Olson claims the officers lacked reasonable suspicion to conduct a *Terry* stop. Third, Olson disputes the district court's factual finding that he first admitted to being

a felon before the officers arrested him. Fourth, and finally, Olson contends the good-faith exception does not apply.[3]

When evaluating a district court's denial of a motion to suppress, we review its legal conclusions de novo and its factual findings for clear error. *United States v. Richmond*, 924 F.3d 404, 410 (7th Cir. 2019).

### A. *Terry* **Stop or De Facto Arrest?**

The Fourth Amendment protects people from unreasonable searches and seizures. U.S. Const. amend. IV. Stopping someone is generally considered a seizure for which probable cause is required. *Id.*; *see also United States v. Reedy*, 989 F.3d 548, 552 (7th Cir. 2021). In *Terry v. Ohio*, the Supreme Court recognized a limited exception to the Fourth Amendment's probable-cause requirement for brief investigatory stops. 392 U.S. 1 (1968). The salient difference between a *Terry* stop and a de facto arrest is the degree of justification required for the seizure. The former requires only reasonable suspicion of criminal activity while the latter demands probable cause. *Rabin v. Flynn*, 725 F.3d 628, 632–33 (7th Cir. 2013).

The distinction between a *Terry* stop and a de facto arrest is subtle. *United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011); *Rabin*, 725 F.3d at 832–33. *Terry* stops often place law enforcement at great risk of physical danger. *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005). Consequently, law enforcement's use of force does not necessarily transform a *Terry* stop into an arrest where the circumstances give rise to a justifiable fear for personal safety. *Id*. If, however, law

---

[3] As discussed in detail below, we find no Fourth Amendment violation. Therefore, we need not address the application of the good-faith exception. *See United States v. Gibson*, 996 F.3d 451, 462 (7th Cir. 2021).

enforcement's use of force during a *Terry* stop is "dispropor-
tionate to the purpose of such a stop in light of the surround-
ing circumstances … the encounter becomes a formal arrest."
*Rabin*, 725 F.3d at 632–33. When considering whether use of
force amounts to a de facto arrest, we examine "whether the
surrounding circumstances would support an officer's legiti-
mate fear for personal safety." *Matz v. Klotka*, 769 F.3d 517, 526
(7th Cir. 2014). No two encounters are identical, so there is
"no litmus-paper test for determining when a seizure exceeds
the bounds of an investigative stop and becomes an arrest."
*Bullock*, 632 F.3d at 1016 (internal quotations omitted).

The officers approached Olson with their guns drawn, or-
dered him to place his hands on the hood of the car, physically
secured his arms, disarmed him, and handcuffed him. In Ol-
son's view, this amounts to a de facto arrest. The officers' de-
cision to draw their weapons and handcuff Olson is atypical
of a permissible *Terry* stop. We have consistently recognized,
however, that the use of such force does not automatically
convert a *Terry* stop into an arrest under certain circum-
stances, such as when officer safety is in question or a weapon
may be present. *United States v. Shoals*, 478 F.3d 850, 853 (7th
Cir. 2007) ("The cases are clear … that police officers do not
convert a *Terry* stop into a full custodial arrest just by drawing
their weapons or handcuffing the subject."); *see also United
States v. Eatman*, 942 F.3d 344, 347 (7th Cir. 2019); *Howell v.
Smith*, 853 F.3d 892, 898 (7th Cir. 2017); *Matz*, 769 F.3d at 525.
Both are true here. Given the unique and extreme circum-
stances of the night in question, the officers' use of force when
approaching Olson was eminently justifiable.

What little the officers knew about Olson when they de-
cided to confront him demanded they do so with extreme

caution. Having watched Olson conceal a gun in the waistband of his pants, the officers knew Olson was armed. Hamilton saw Olson drinking from a "tallboy" style can possibly containing alcohol, suggesting Olson could be intoxicated. Olson carefully scrutinized his surroundings, which Gatdula and Hamilton interpreted to be "countersurveillance" measures to avoid detection. The officers had little time to confront Olson before he had the opportunity to leave the area, and Marzullo was particularly concerned Olson might pursue the group of officers that recently left the chapel. Each of the officers testified, and the district court found, that one purpose of the stop was to ensure law enforcement and civilian safety.

Beyond Olson's individual actions, the singular circumstances of the night in question reinforce the appropriateness of the officers' response. During the weekend of May 30–31, 2020, widespread "chaotic, volatile, and dangerous" civil unrest characterized by rampant violence and arson gripped Madison. Law enforcement and civilians alike faced a serious risk of grave bodily harm. MPD officers were a particular target of an unpredictable mob comprised of several hundred people, some portion of whom came equipped with weapons and body armor. That weekend, protestors physically assaulted MPD officers and threatened them with further violence and death. Indeed, shortly before the officers approached Olson, a group of MPD officers left the chapel to assist an injured comrade. In this explosive atmosphere, it would have been foolish for the officers to treat Olson with anything but the utmost caution.

Olson's initial seizure was a *Terry* stop, not a de facto arrest. We must determine, therefore, only whether the officers had reasonable suspicion to stop Olson.

**B. Reasonable Suspicion**

*Terry* authorizes a limited intrusion into an individual's privacy without violating the Fourth Amendment where law enforcement officers have reasonable suspicion of criminal activity. *Terry*, 392 U.S. at 30; *see also Richmond*, 924 F.3d at 411. Reasonable suspicion demands "only 'a minimal level of objective justification,'" *United States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)), which is something "more than a hunch but less than probable cause" and significantly less than a preponderance of the evidence, *Richmond*, 924 F.3d at 411 (citing *Wardlow*, 528 U.S. at 123). Law enforcement must point to "specific and articulable facts which, taken together with rational inferences from those facts[,] reasonably warrant that intrusion." *Richmond*, 924 F.3d at 411 (internal citations omitted). Whether reasonable suspicion of criminal activity justified a *Terry* stop is a fact-intensive, objective inquiry encompassing the totality of the circumstances known to the officers at the moment of seizure. *United States v. Howell*, 958 F.3d 589, 597 (7th Cir. 2020). Officers may lean upon their experience and specialized training to draw inferences from and deductions about available cumulative information. *Hill*, 818 F.3d at 294. We review a district court's determination of reasonable suspicion de novo. *United States v. Lopez*, 907 F.3d 472, 479 (7th Cir. 2018).

Based on the available information about Olson, along with the circumstances of the night in question, the officers reasonably suspected Olson was engaged or about to engage

in criminal activity. Carrying a gun while "under the influence of an intoxicant" is a criminal misdemeanor in Wisconsin. Wis. Stat. § 941.20(1)(b); *see also State v. Christen*, 958 N.W.2d 746, 753, 755 (Wis. 2021) (noting § 941.20(1)(b) "limits the circumstances under which the lawful firearm owner may use or carry the firearm" and recognizing "Wisconsin has a long tradition of criminalizing the use and carrying of a firearm while intoxicated"). Hamilton testified he saw Olson drinking from a "tallboy" style can, which he reasonably inferred might contain alcohol, before arming himself with a gun. One of the officers' objectives in confronting Olson was to determine whether he was drinking alcohol while carrying a gun.

CCW permit holders are entitled to carry concealed guns in Wisconsin. Wis. Stat. § 941.23(2)(d). According to Gatdula and Hamilton, Olson's behavior departed from that of CCW permit holders. Olson placed his gun in the waistband at the small of his back, but Gatdula testified most CCW permit holders typically holster their guns. The officers cited their skepticism Olson had a valid CCW permit as additional justification to initiate the stop.

Olson quibbles with the relevance and scope of Gatdula's professional experience. Gatdula testified as to his experience with people carrying concealed and open guns. Olson notes Gatdula lacks experience with those who carry concealed guns without a CCW permit, but this is a red herring. Gatdula did not need to affirmatively place Olson within the population of those without CCW permits, he only needed to exclude Olson from the population of CCW permit holders. Gatdula's testimony that he had professional experience with the typical behavior of CCW permit holders, and that Olson's

behavior deviated from this pattern, is sufficient. *See, e.g.,*
*Richmond*, 924 F.3d at 412.

Olson's actions, demeanor, and the surrounding circum-
stances reinforce the reasonableness of the officers' suspicion
Olson was engaged (or would soon engage) in criminal activ-
ity. Olson decided to come, armed with a gun, to a scene of
active and dangerous civil revolt replete with criminality
where officers and civilians were under direct threat of phys-
ical violence. True, proximity to criminal activity "does not,
by itself, support a particularized suspicion" of Olson's crim-
inality, but "it is among the relevant contextual considera-
tions in a reasonable suspicion analysis." *Richmond*, 924 F.3d
at 411–12. Indeed, Olson arrived in downtown Madison
around 11:00 p.m. on May 31, 2020, and was thus in violation
of the city's curfew. While the record is silent as to whether
the officers were aware of this fact at the time they decided to
confront Olson (and, therefore, we cannot rely upon this de-
tail in evaluating reasonable suspicion), it increases our con-
fidence Olson's presence was not wholly innocuous. Moreo-
ver, the district court credited Gatdula's and Hamilton's char-
acterization of Olson's behavior prior to arming himself as
"countersurveillance" which they interpreted as suggestive of
his intent to "do something … he didn't want … seen or dis-
covered" and avoid the attention of law enforcement. While
Olson's evasive and cagey behavior is certainly subject to in-
nocent construction, "behavior that may seem innocent under
some circumstances[] may amount to reasonable suspicion
when viewed in the context at play at the time of the stop."
*D.Z. v. Buell*, 796 F.3d 749, 754 (7th Cir. 2015).

And context is crucial to our ruling here. We cannot over-
state the singularity of the conditions in Madison that night.

The city experienced an almost complete collapse of civil order. Crowds of hundreds of enraged protestors roamed the streets, some of them armed, targeting MPD officers, and creating an intensely dangerous environment. Indeed, shortly before Olson's arrival, the crowd physically attacked an MPD officer nearby. Olson elected to inject himself, and his gun, into this maelstrom. Considered holistically, the totality of the circumstances along with Olson's behavior easily satisfy the "minimal level of objective justification" required to establish reasonable suspicion for a *Terry* stop. *Wardlow*, 528 U.S. at 123.

**C. The Timing of Olson's Admission**

Olson asks us to disturb the district court's adoption of the magistrate judge's factual finding regarding the timing of his admission. Specifically, Olson claims he first told officers he was a felon only after they placed him under arrest. Accepting Olson's version of events calls into question the probable cause supporting his arrest for possession of a gun as a felon.

Resolving a motion to suppress involves a highly fact-specific inquiry. *Richmond*, 924 F.3d at 410–11. Here, the magistrate judge enjoyed the benefit of observing witness demeanor and listening to live testimony during the suppression hearing. *Id*. Consequently, as the district court adopted the magistrate judge's factual findings, we review the magistrate judge's factual findings and credibility determinations for clear error. *United States v. Biggs*, 491 F.3d 616, 621 (7th Cir. 2007). Clear error warrants reversal only where we are "left with the definite and firm conviction that a mistake has been made," such as where a magistrate judge "credited exceedingly improbable testimony." *United States v. Wendt*, 465 F.3d 814, 816 (7th Cir. 2006) (internal quotations omitted). We must "accept the evidence unless it is contrary to the laws of

nature[] or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *Id*. (internal quotations omitted). "[D]eterminations of witness credibility can virtually never be clear error." *Biggs*, 491 F.3d at 621 (internal quotations omitted).

At root, Olson asks us to overturn the magistrate judge's credibility determination for not one but all three officers. On this record, we cannot conclude the magistrate judge clearly erred in crediting the officers' suppression hearing testimony. The magistrate judge was justifiably concerned with the discrepancy between the officers' written reports and their subsequent testimony, a discrepancy which favored the government's position. Hamilton and Gatdula's contemporaneous reports did not mention any pre-arrest admission. Marzullo's report indicated Olson only admitted he was a felon after the officers placed him under arrest. At the suppression hearing, however, all three officers testified their written reports were incomplete or incorrect and that Olson said he was a felon twice with the first admission occurring pre-arrest.

Any omissions or inaccuracies in the officers' contemporaneous reports are plausibly explained by their sleep deprivation and stress. First, all three officers characterized the weekend of May 30–31, 2020, as one of unprecedented stress. Hamilton in particular described the experience as one of the "most stressful and high impact" of his 14-year career. Second, each of the officers wrote their reports in the early hours of June 1, 2020, while suffering extreme sleep deprivation. Gatdula was functioning on between two and three hours of sleep when he wrote his report and was "extremely exhausted." Marzullo wrote his report after working a 14-hour shift which was "well outside [his] normal hours of

operation." Third, none of the officers reviewed their reports immediately after writing them. Instead, each affirmed the truth and accuracy of their suppression hearing testimony. Fourth and finally, the officers' entire interaction with Olson unfolded extremely quickly. Approximately 90 seconds elapsed between the officers' decision to approach Olson and Hamilton's radio call to the MPD command post indicating Olson was under arrest. Under these conditions, it does not strain credulity to imagine the officers inadvertently misstated the sequence of events or omitted key details in their written reports. We will not second-guess the magistrate judge's credibility determination; there is no clear error here.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.