In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-1692

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TERRANCE J. SHAW,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 07-CR-10004-001 — **Joe Billy McDade**, *Judge.*

ARGUED DECEMBER 3, 2021 — DECIDED JULY 6, 2022

Before ROVNER, HAMILTON, and JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* Terrance Shaw violated multiple conditions of his supervised release. The district court revoked his supervised release and sentenced him to two years' imprisonment—well above the range recommended by the Sentencing Commission's policy statements. The court did not mention the sentencing factors from 18 U.S.C. § 3583(e), the statute that governs revocation of

supervised release, as grounds for the upward variance. The court instead explained that it was sending Shaw to prison to "help" him and give him a chance to access rehabilitative programs. Congress has directed sentencing courts to recognize that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Courts are thus precluded from imposing or lengthening a prison term to promote an offender's rehabilitation. *Tapia v. United States*, 564 U.S. 319, 325–26 (2011). Because the record suggests that the district court lengthened a term of imprisonment to rehabilitate Shaw, we vacate Shaw's sentence and remand for further proceedings.

## I

### A. Factual Background

Shaw served 10 years in prison after he pleaded guilty to possessing cocaine base with intent to distribute, *see* 21 U.S.C. § 841(a)(1) and (b)(1)(B), and possessing a firearm as a felon, *see* 18 U.S.C. § 922(g). Upon his release in January 2020, Shaw began a six-year term of supervision.

Shaw's supervision was rocky from the start. During the first two months, Shaw tested positive for marijuana, methamphetamine, and amphetamine, and was arrested for driving on a revoked license. The district court reprimanded him with 60 days of home confinement and ordered him to participate in cognitive behavioral therapy. Two months later, Shaw's probation officer reported that Shaw had violated the terms of home confinement and submitted a fake paystub. Because the COVID-19 pandemic was now in full swing, the officer recommended no action. But six months after that, Shaw received another citation for driving on a revoked license. A

month after that, Shaw was caught again driving without a license—this time, while traveling outside the judicial district without permission.

As a sanction for his repeated violations, the district court ordered Shaw to spend five weekends in county jail. During his first weekend in jail, Shaw got into an argument with jail staff. He then threatened to kill himself so that staff would have to pay damages to his kids, threatened to flood his cell, and told staff he would return next week with "a gift" (which staff interpreted as a threat). When staff told Shaw that they would stop allowing him to serve his supervision requirements at the jail, and that he would need to seek a supervision modification from the district court, Shaw cursed at them.

Shaw's probation officer then petitioned for revocation. The officer cited Shaw's behavior in jail, plus Shaw's failure to attend court-mandated therapy. The officer also filed a memorandum describing Shaw's supervision history and failure to adjust to life outside prison. Among other things, the memorandum noted that Shaw had obtained an apprenticeship with a laborer's union shortly after his release, but the union terminated his employment because he failed to complete classes, attend meetings, and submit his training hours. The memorandum further described what the officer saw as Shaw's attempted manipulation of the court during the revocation proceedings. Most significantly, in an attempt to obtain a continuance, Shaw claimed at his initial appearance that his son had nowhere to go because of his arrest. His son actually lived with a family member.

### B. District Court's Decision

Shaw admitted to the charged violations with only minor quibbles about some of the facts. (For example, he denied the exact phrasing of some of his threats to jail staff.) He also admitted that the government could prove he had been malingering when he threatened suicide at the jail. The district court accepted, without objection, the probation officer's calculation that these violations subjected Shaw to a statutory maximum of 5 years' imprisonment, with an advisory range of 8–14 months' imprisonment under the Sentencing Guidelines' relevant policy statement.

The government asked the court to impose two years' imprisonment. It highlighted what it argued were examples of Shaw's repeated dishonesty, and it argued that an above-guidelines sentence was necessary to reflect Shaw's violation of the court's trust.

Shaw asked for time served. His counsel started the argument on Shaw's behalf by noting that Shaw had signed up for online college courses. But the court interrupted counsel, criticized Shaw for his inability to hold down a job, and questioned Shaw at length about what he hoped to accomplish with an associate degree. Shaw explained that he wanted to someday start his own business—a statement the court dismissed as a "pipe dream." The court pointed out that despite getting a high-paying union job during the height of the pandemic, Shaw had lost the job because he failed to perform "trivial" tasks like reporting his training hours.

Shaw's counsel and the court then engaged in a back and forth about what Shaw needed to end his cycle of violations. Counsel argued that Shaw was having trouble adjusting to

life after prison, and that Shaw's self-defeating behavior was evidence that he needed psychological help and therapy—not more prison time. Counsel asked the court to impose supervision conditions related to rehabilitation, such as a psychological evaluation and further therapy. But the court expressed skepticism about allowing Shaw "to again participate in all the programs he has rejected." And it asked counsel to explain how, if Shaw did not return to prison, the court could ensure his compliance with rehabilitative efforts.

During Shaw's allocution, Shaw, like counsel, expressed his belief that he needed rehabilitation. He asked for one more chance on supervision to achieve rehabilitation through mental-health treatment, drug treatment, and cognitive therapy. In response, the court asked him what assurances he could make that he would live up to the court's expectations.

The court then announced its sentence. The court recognized the possibility, advocated by counsel, that Shaw might have experienced a negative adjustment from prison or something akin to posttraumatic stress disorder. But the court also explained that it had familiarized itself with Shaw's violations and how he failed to take advantage of the opportunities that probation had provided—opportunities the court categorized as "the best our probation office can give him."

The district judge contrasted Shaw's background against his own. Both the judge and Shaw are African American, and both had parents who died while they were young. But the judge explained that he had grown up picking cotton in Jim Crow-era Texas, yet he had done whatever he could to get an education and leave that environment. He said that he expected the same from Shaw and believed that Shaw had the same potential. Nonetheless, the judge continued, Shaw had

squandered the good fortune he had received in the last year when he was accepted into a union and started earning middle-class wages. The judge explained that reading Shaw's file reminded him of people he knew while growing up who were irresponsible and unreliable.

The judge explained that counsel's arguments had tempered his feelings about Shaw, and he thought Shaw was "worth trying to save." But Shaw first had to pay the consequence for his "sin" of failing to accept his good fortune. "[W]hether we call it God or what, when fortune gives you a chance, a second chance, you've gotta take it."

The judge concluded:

> I hope you can perceive that I care for you. You're not just a—I care for you. I'm like a parent who cares for his child, but he knows that I gotta do something hurtful if I'm gonna help this child that I love.

> I'm gonna sentence you to 24 months, sir, and with your time served, it may end up somewhere between 18 or 20 months. That period of time will give you a chance, hopefully, to enjoy some—to look at the programs you're gonna be offered in prison in a totally different light.

Shaw had already survived 13 years in prison, the judge continued, so this time he could "really focus on how [he] can get the benefit of prison, how [he] can come out of prison being a better person." The judge acknowledged that Shaw did not receive the time-served sentence Shaw had requested, but the judge said he was "doing what I think is the best way I can help you."

The district court did not mention the sentencing factors listed in 18 U.S.C. § 3553(a). Further, apart from the court's statements about Shaw's ability to access rehabilitative programs in prison, and its explanation that it was doing what it thought was best to help Shaw, the court provided no explanation for the length of Shaw's prison term or why an upward variance from the advisory range was necessary.

## II

On appeal, Shaw asserts three arguments: (1) the district court violated the rule from *Tapia v. United States*, 564 U.S. 319 (2011), by sentencing him to a term of imprisonment for the purpose of rehabilitation; (2) the court failed to consider the relevant sentencing factors in 18 U.S.C. § 3553(a); and (3) the court impermissibly relied on its own religious biases when it called Shaw's conduct a "sin." The first two contentions are interrelated, so we discuss them together; we address the final contention separately.

Because Shaw raises claims of constitutional and procedural sentencing error, our review is de novo. *United States v. Coe*, 992 F.3d 594, 597 (7th Cir. 2021). The government unpersuasively argues that plain-error review should apply to Shaw's *Tapia* and religious-bias claims because Shaw failed to raise those objections in the district court. But criminal defendants are not required to object to a district court's ruling after it has already been made. *United States v. Pennington*, 908 F.3d 234, 238 (7th Cir. 2018). Here, Shaw did not have any opportunity to raise a *Tapia* objection, nor to object to the district court's purportedly religious comments, because the court did not announce the reasoning for its sentence until the end of the hearing when it imposed judgment.

When we have applied plain-error review to forfeited *Tapia* claims in other cases, we have done so because the district court gave the defendant an opportunity to object before it entered judgment. We have often encouraged district courts to give lawyers a final chance at the end of a sentencing hearing to raise any arguments or objections the court has not yet addressed. *See, e.g., United States v. Lewis*, 823 F.3d 1075, 1083 (7th Cir. 2016). Defendants may forfeit any unvoiced *Tapia* claims when a court follows this practice by announcing a tentative decision, along with its reasoning, and then inviting objections before imposing the sentence. *See United States v. Burrows*, 905 F.3d 1061, 1067 (7th Cir. 2018); *United States v. Kopp*, 922 F.3d 337, 341 n.2 (7th Cir. 2019); *United States v. Holman*, 840 F.3d 347, 353 (7th Cir. 2016). The same is true for unvoiced constitutional challenges. *See United States v. Peterson*, 711 F.3d 770, 775 (7th Cir. 2013). But because the district court did not follow this practice, and because Shaw lacked any other opportunity to raise his objections before the court imposed judgment, the default de novo standard applies.

### A.  The Sentencing Factors and the *Tapia* Rule

####   1.  *The Standard upon Revocation from Supervised Release*

When considering whether to modify or revoke a term of supervised release, a district court must consider the relevant statutory factors in 18 U.S.C. § 3583(e). *See United States v. Robertson*, 648 F.3d 858, 859 (7th Cir. 2011); *see also* § 3583(e) (cross-referencing 18 U.S.C. § 3553(a)(1), (a)(2)(B)–(D), (a)(4)–(7)). Broadly speaking, the § 3583(e) factors include the nature of the offense, the defendant's history and characteristics, the need for deterrence and to protect the public, the need to

provide restitution for victims, and the policy statements of the Sentencing Commission.

The factors under § 3583(e) also include the need to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." 18 U.S.C. § 3553(a)(2)(D). But a district court's consideration of this factor is limited by the Supreme Court's decision in *Tapia*, which held that federal courts are precluded from imposing or lengthening a prison term to promote an offender's rehabilitation. *Tapia*, 564 U.S. at 325–26. As the Court explained, its holding flowed from the statutory scheme surrounding federal sentences.

When Congress enacted the Sentencing Reform Act of 1984, it redefined the purposes of sentencing. Gone was the old, rehabilitative model of prison embodied by indeterminate sentences and parole. Instead, Congress moved toward a system of determinate sentences; it hoped that doing so would cut down on sentencing disparities and do away with "outmoded" assumptions about prison's rehabilitative function. *Mistretta v. United States*, 488 U.S. 361, 365–66 (1989) (describing the act's effect). Under this regime, federal courts must choose between prison (often followed by a term of supervised release), fine, or probation, and impose a sentence that is "sufficient, but not greater than necessary" to reflect the four general purposes of sentencing described in 18 U.S.C. § 3553(a)(2): retribution, deterrence, incapacitation, and rehabilitation.

District courts consider these four purposes when fashioning a sentence but only "to the extent that they are applicable." 18 U.S.C. § 3551(a). Not all purposes apply to all types of sentences, and courts must disregard certain purposes

depending on which type of sentence they are imposing. *Tapia*, 564 U.S. at 325–26. For example, a court may not impose a term of supervised release for the purpose of retribution. *Id.* at 326 (citing 18 U.S.C. § 3583(c)). And, as part of the departure from an indeterminate sentencing system, Congress directed courts to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Accordingly, § 3553(a)'s fourth sentencing purpose—the need for rehabilitation through training, medical care, or other programs—is not applicable when a court imposes a term of imprisonment.

In *Tapia*, the Supreme Court vacated a sentence after the district court lengthened the defendant's prison term to ensure that she could complete a prison drug-treatment program. 564 U.S. at 321–22. Not only did Congress explicitly direct district courts to disregard rehabilitative needs when imposing prison time, the *Tapia* Court explained, Congress also failed to empower courts with any means to compel participation in prison-based rehabilitative programs. In contrast, when Congress instructed courts to consider rehabilitation before imposing probation or supervised release, *see* 18 U.S.C. §§ 3562(a) and 3583(c), it also enacted provisions allowing courts to order the offender's participation in specific programs and facilities. *See id.* §§ 3563(a)(4), 3563(b)(9), 3563(b)(11), 3583(d). In other words, "when Congress wanted sentencing courts to take account of rehabilitative needs, it gave courts the authority to direct appropriate treatment." *Tapia*, 564 U.S. at 330. If a court wishes to order treatment for an offender, it must do so using alternatives to imprisonment.

Although *Tapia* involved an appeal from an initial sentencing, the government does not dispute that the same rule

applies during a revocation of supervised release. We likewise have assumed that it does, even though we have not explicitly held so. *See, e.g., Kopp*, 922 F.3d 337 (vacating revocation sentence for *Tapia* error). And every circuit to explicitly consider the issue has concluded that *Tapia*'s reasoning applies equally when a court decides whether to impose a prison term in response to violations of supervised release. *See United States v. Schonewolf*, 905 F.3d 683, 690 (3d Cir. 2018); *United States v. Vandergrift*, 754 F.3d 1303, 1309 (11th Cir. 2014); *United States v. Lifshitz*, 714 F.3d 146, 150 (2d Cir. 2013); *United States v. Deen*, 706 F.3d 760, 765–67 (6th Cir. 2013); *United States v. Garza*, 706 F.3d 655, 657–59 (5th Cir. 2013); *United States v. Bennett*, 698 F.3d 194, 198 (4th Cir. 2012); *United States v. Mendiola*, 696 F.3d 1033, 1037–42 (10th Cir. 2012); *United States v. Taylor*, 679 F.3d 1005, 1006 (8th Cir. 2012); *United States v. Grant*, 664 F.3d 276, 282 (9th Cir. 2011); *United States v. Molignaro*, 649 F.3d 1, 5 (1st Cir. 2011) (Souter, J., sitting by designation). We see no reason to depart now from this consensus.

### 2. *Application to Shaw's case*

We agree with Shaw that his sentence violates *Tapia* because a desire to rehabilitate him was the driving force behind the district court's decision to impose a two-year prison term. At the conclusion of Shaw's sentencing hearing, the district court explained that it was imposing a 24-month prison term because "[t]hat period of time will give you a chance, hopefully, to enjoy some—to look at the programs you're gonna be offered in prison in a totally different light." This comment was the court's only statement about the length of Shaw's prison term. And after explaining the length of the sentence, the judge further emphasized that he was "doing what I think

is the best way I can help you" and that Shaw should focus on how to "get the benefit of prison" and "come out of prison a better person."

The government maintains that the court's comments about rehabilitation were an afterthought. It says that the court first relied on permissible grounds to decide the sentence and then, because Shaw was going to prison anyway, the court merely mentioned that rehabilitative programs would be available. If so, then the court acted permissibly; *Tapia*'s only prohibition is against citing rehabilitation as a reason for imprisonment. After a court has decided upon a sentence of imprisonment, that court is free to discuss the opportunities for rehabilitation within prison or encourage the defendant to seek out relevant programs. *Tapia*, 564 U.S. at 334.

In support of its position that the court complied with *Tapia*, the government cites two cases in which a district court referenced rehabilitation while imposing a prison sentence. In *Burrows*, 905 F.3d at 1067, a district court chose a prison sentence that it thought would "be sufficient time to address the harm caused by your conduct and to also hopefully specifically deter you *and give you time to avail yourself of the sex offender treatment*." In *United States v. Lucas*, 670 F.3d 784, 795 (7th Cir. 2012), a court imposed a prison sentence that would "serve to hold the defendant accountable, serve as a deterrent, protect the community, provide the opportunity for rehabilitative programs and achieve parity with sentences of similarly-situated offenders." We upheld both judgments because, although the courts had mentioned rehabilitation as one of several reasons for the imposed prison terms, context

made clear that other permissible factors were the primary considerations behind the prison sentences.

*Burrows* and *Lucas* do not help the government because the context here shows the opposite: rehabilitation was the primary reason for the length of the imposed prison term. Shaw's need for rehabilitation was the focus of Shaw's arguments and the court's comments throughout the hearing. Shaw asked for leniency because, he argued, he needed a psychological evaluation and behavioral treatment. So instead of imprisonment, he requested a return to supervision along with the reimposition of treatment programs—programs the court could impose only as part of a sentence of supervised release. *See Tapia*, 564 U.S. at 330. The court rejected Shaw's arguments because it did not believe that Shaw was competent to comply with treatment programs. It then imposed a two-year prison term, which it explained was enough time for Shaw to get the treatment he sought. Taken as a whole, the court's approach to sentencing suggests that it believed an above-guidelines term of imprisonment was the better option to ensure Shaw's compliance with rehabilitative programs.

The court also framed its sentence in paternalistic terms, explaining that the court was "like a parent who cares for his child," imposing a "hurtful" prison sentence to "help this child that I love." The court finished by stating that although Shaw was "not getting everything" he asked for at sentencing (that is, a return to supervision without further imprisonment), the judge was "doing what I think is the best way I can help you." The most plausible reading of these statements is that the court thought prison would rehabilitate Shaw in a way that supervision could not.

To be clear, the record does not suggest that rehabilitation was the only reason for revocation. Although the court did not mention the sentencing factors, it alluded to other reasons for revoking Shaw's supervision. For example, it discussed the nature of Shaw's violations, his personal history and characteristics, and the need to deter him from further misconduct. *See* 18 U.S.C. § 3553(a)(1), (a)(2)(B). These are all factors that could support *a* term of imprisonment. But rehabilitation was the only reason cited by the court for the *length* of the 24-month prison term. That term was an upward variance of 10 months, and more than 70 percent higher than the top of the 8-to-14-month advisory range. Because the court did not explain how any other considerations factored into the length chosen, our impression from the overall transcript is that a desire for rehabilitation was the driving force for the court's decision. Rehabilitation was not merely "thrown into a blender with myriad other factors." *United States v. Vazquez-Mendez*, 915 F.3d 85, 88 (1st Cir. 2019).

Again, we recognize that courts are free to discuss the availability of rehabilitative programs and even encourage defendants to use them. But by relying on rehabilitation as the sole basis for an upward variance, the court crossed the line from permissible comments to impermissible consideration. Because *Tapia* applies to both the imposition of a prison sentence and the lengthening of one, the court's reliance on rehabilitation to impose the upward variance warrants remand.

We also recognize the difficult position that district courts find themselves in under *Tapia*. On one hand, 18 U.S.C. § 3583(e) requires courts to consider several purposes of sentencing—including rehabilitation—before revoking an offender's supervision or imposing a sentence. On the other,

§ 3582(a) forbids courts from relying on rehabilitation as a reason for prison time. Combined, these provisions seemingly force courts to walk a tightrope where they must both demonstrate their consideration of the offender's need for rehabilitation while also disavowing that consideration as a reason for any resulting term of imprisonment.

This nuanced consideration of rehabilitation, however, is an integral part of the federal system of determinate sentences. Depending on how a court weighs the need for rehabilitation, it might decide to keep the defendant on supervision and impose new conditions in lieu of imprisonment. Or, if the court decides that imprisonment is necessary to satisfy another purpose of sentencing such as the need for deterrence or to protect the public, it can address the defendant's rehabilitative needs through a subsequent term of supervision. Then, as a defendant serves that term, the court can modify the conditions of supervision as necessary to reflect, among other things, the defendant's evolving rehabilitative needs. *See* 18 U.S.C. § 3583(e)(2). But a court generally cannot make similar adjustments to a prison sentence.

Further, the difficulty posed by *Tapia* is not unique. Courts face a similar dilemma with regard to § 3553(a)(2)(A), which dictates that sentences provide just punishment. Subsection (a)(2)(A) is among the provisions a court must consider during an initial sentencing. But to the extent that the sentence includes a term of supervision—as most sentences do—the court may not consider punishment when determining the length and conditions of supervision. 18 U.S.C. § 3583(c). Yet courts routinely manage to handle this factor appropriately; they fashion a term of imprisonment that reflects (among other things) the need to impose just punishment, before

pivoting to supervision and assessing what future conditions will be necessary to rehabilitate the defendant and deter the defendant from future misconduct.

When district courts explicitly identify the sentencing factors listed in § 3583(e) and explain how they incorporated those factors into the final sentence, they mitigate the possibility of a *Tapia* challenge on appeal. Yet the district court here did not mention the factors at all (though, as we mentioned earlier, the court alluded to them as grounds for revocation). And given the marquee role that Shaw's need for rehabilitation played in his mitigation arguments and the court's statements, the court's silence as to the other factors leaves us with the impression that rehabilitation was the seminal factor in the length of the prison sentence.

Because we vacate the judgment on *Tapia* grounds, we need not address Shaw's argument that the court's failure to mention the statutory sentencing factors is an alternative ground for remand. *See, e.g., United States v. Boultinghouse*, 784 F.3d 1163, 1177–80 (7th Cir. 2015) (vacating sentence when court mechanically imposed a guidelines sentence upon revocation without any further explanation). We note, however, that these two issues are intertwined. Even if a sentencing court need not march through the factors in checklist fashion or explicitly address each one, *see United States v. Dawson*, 980 F.3d 1156, 1164 (7th Cir. 2020); *United States v. Barrera*, 984 F.3d 521, 524 (7th Cir. 2020), the court should still make clear how the factors play into its judgment so that an appellate court is not forced to infer the factors' influence from context. Here, without express indication from the district court about how it weighed the applicable sentencing factors, we are left with

only the court's clear statements about how the inapplicable factor of rehabilitation determined Shaw's prison time.

Because rehabilitation played a primary role in the court's decision to impose a 24-month prison term, we vacate the sentence on that basis. We otherwise take no position on the appropriateness of Shaw's sentence. Although district courts are not required to address every statutory factor in checklist fashion, we nonetheless encourage the district court to explicitly explain on remand how it weighs the applicable factors when resentencing Shaw.

## B. The District Court's Religious Comments

Shaw's alternative argument that the judge erred by infusing his religious views into the judgment warrants only brief mention. Shaw seizes on a single out-of-context statement in which the court called Shaw's failure to accept his good fortune a "sin":

> [Y]ou've got to pay the consequence. That's the beginning. You have to pay your debt to this Court and to what's right and to your failure to accept your good fortune. And that's a sin. When you get a second chance, when fortune -- whether we call it God or what, when fortune gives you a chance, a second chance, you've gotta take it. And for your failure to do that, there's gotta be a consequence.

According to Shaw, this statement alone requires remand because it creates the perception that the court punished him for offending the court's own sense of religious propriety. *See, e.g.*, *United States v. Bakker*, 925 F.2d 728, 740–41 (4th Cir. 1991).

We are unpersuaded. A defendant cannot obtain reversal merely by identifying statements that appear problematic when taken out of context; a defendant must also show that the judge actually relied on an impermissible factor to arrive at the sentence imposed. *Coe*, 992 F.3d at 598. Context here shows that the district court simply chose this language to emphasize how it felt about Shaw's actions. Calling Shaw's wasted potential a "sin" was only one of several analogies the court used to get its point across. The judge also analogized his use of education as a way out of Jim Crow Texas to Shaw's good fortune in landing the union job. The judge likewise compared his relationship with Shaw to "a parent who cares for his child." Given the court's use of other analogies, the most logical reading of the "sin" comment is that the court simply used religious terminology as a metaphor.[1] As Shaw conceded during oral argument, the court used the word "fortune" to describe Shaw's circumstances more times than it used the word "God." Rather than an impermissible imposition of the court's religious beliefs, these statements strike us as part of a permissible—and laudable—attempt by the court to make a connection with Shaw.

Because we see no evidence of religious bias in the record, we also see no reason to grant Shaw's request under Circuit Rule 36 to reassign the case on remand to a different district judge.

---

[1] *See Sin*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/sin (last visited Jun. 14, 2022) (providing alternative definitions such as "an action that is or is felt to be highly reprehensible" and "an often serious shortcoming").

**III**

Because the district court's desire to rehabilitate Shaw was a driving force behind the court's imposition of a 24-month term of imprisonment, we VACATE the judgment and REMAND for further proceedings consistent with this opinion.

HAMILTON, *Circuit Judge*, concurring in the judgment. I agree with much of the lead opinion's general description of the law of sentencing. I also agree with the lead opinion analysis of *Tapia v. United States*, 564 U.S. 319 (2011) and 18 U.S.C. § 3582(a), and its recognition that *Tapia* and the statute put district judges in a difficult position. Ante at 14–15. I write separately to highlight that dilemma. As I understand Judge McDade's thinking in this case, rehabilitation efforts on supervised release were not working because Shaw was not participating in them. Along with his other, repeated violations of supervised release conditions, that was a good and sufficient reason to impose a prison sentence here, and even a sentence longer than the Guidelines advised. What is forbidden by § 3582(a) and *Tapia* is an indication that the goal of rehabilitating Shaw *in prison* drove the decisions whether to send Shaw back to prison and for how long.

The difficulty is that in deciding whether to impose a sentence or to revoke supervision, the judge must consider several purposes of sentencing, including rehabilitation. But once the court decides to sentence a defendant to prison, the court may not do so for purposes of rehabilitation. And further, if the court imposes a prison sentence, without considering rehabilitation as a goal, the judge may then encourage the defendant to participate in a range of rehabilitative programs.

Here, in other words, is the cognitive challenge for a sentencing judge: first, consider rehabilitation at step one, in choosing among types of sentences. Next, if imposing a prison sentence, at step two, stop thinking about rehabilitation. Finally, encourage rehabilitation at step three. That's a fair reading of § 3582(a) and *Tapia*, but I do not believe the decision-making mind can erase so easily what has gone before. We

expect the judge to consider so many factors and goals in reaching a final sentence and to explain them on the record.

The lead opinion recognizes that § 3582(a) and *Tapia* put a sentencing judge in this difficult position that seems to force the judge to "walk a tightrope." Ante at 15. The majority insists, though, that this "nuanced consideration" of rehabilitation is necessary under § 3582(a) and *Tapia*. That is an accurate reading of those authorities, but these instructions from Congress and the Supreme Court are not realistic and invite hypocrisy or silence from sentencing judges.

When I read this sentencing transcript, I see a judge who was patient, humane, wise, and fair. Judge McDade was dealing with an unusually difficult case. The defendant had been provided multiple opportunities to straighten out his life, including a path to an unusually well-paying job in the middle of the pandemic. He kept wasting those opportunities. The judge's choice to revoke Shaw's supervised release and to send him to prison was reasonable and easily predictable. As the lead opinion notes, Shaw had repeatedly violated important conditions of his supervised release. Sanctions less severe than prison had not had any noticeable effect. The judge was not required to credit Shaw's assurances that this time he would finally follow through on therapy and other rehabilitative programs if they were imposed again as conditions of supervised release. A more legalistic explanation of Shaw's revocation sentence on remand should pass muster as long as the district court makes explicit reasons that were left implicit in this transcript and avoids hinting that goals of rehabilitation in prison affected the fact or length of the prison sentence.

*Tapia* is just one example of how federal sentencing law has become more and more complex, with more and more

opportunities for reversible error. A district judge can reduce
the risk of reversible error by disengaging from the individual
defendant and the difficult challenges: Just calculate the
Guidelines and follow them, perhaps noting that any tricky
guideline issue had no effect on the bottom line and that the
§ 3553(a) factors control. As was sometimes true during the
years when the Sentencing Guidelines were binding, an error-
free sentencing hearing can still sound a lot like an arithmetic
problem. A remand like this one further encourages that sort
of mechanical march through the Guidelines and the statu-
tory factors.

Yet we hope for more. We want the sentencing judge to
engage with the defendant, the offense, and victims—under-
standing the stories behind the crime and the prospects for
the future. We want the judge to sentence the defendant as an
individual with his own history and characteristics and to tai-
lor the sentence to those individual circumstances. See gener-
ally *Concepcion v. United States*, 142 S. Ct. —, — (2022).

That's what Judge McDade was doing in this difficult case,
trying to reach Shaw in any way he could: drawing on his
own history, drawing on concepts of faith, ethics, and sin, and
explaining in almost parental terms why the sentence needed
to be more severe than the time-served slap on the wrist that
Shaw sought. I view this remand as compelled by § 3582(a)
and *Tapia*, but unfortunate and otherwise unnecessary.