In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 23-2828 & 23-2831

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAZMINE ERVING,

*Defendant-Appellant.*

_____

Appeals from the United States District Court for the
Central District of Illinois.
Nos. 1:22-cr-10033 & 1:20-cr-10012 — **James E. Shadid**, *Judge.*

_____

ARGUED APRIL 15, 2024 — DECIDED JANUARY 20, 2026

_____

Before KIRSCH, PRYOR, and KOLAR, *Circuit Judges.*

PRYOR, *Circuit Judge.* Dazmine Erving was charged with
unlawfully possessing a firearm after a police officer found a
handgun in his car. 18 U.S.C. § 922(g). Erving moved to sup-
press the evidence against him, arguing that the officer lacked
reasonable suspicion for the search. The district court found
the question to be a "close call" but ultimately denied the mo-
tion. Erving then pleaded guilty and received a sentence at

the upper end of the advisory United States Sentencing Guidelines range.

On appeal, Erving contends that the district court should have granted his suppression motion because the officer did not have reasonable suspicion to conduct a protective search of his car. He also argues that the court committed procedural and constitutional errors at sentencing. Because Erving points to no reversible error, we affirm.

## I.   BACKGROUND

We recount the facts, which are not in dispute, as they were developed at the suppression hearing. *See United States v. Davis*, 44 F.4th 685, 688 (7th Cir. 2022).

### A. Factual Background

On September 14, 2022, Lieutenant Erin Barisch of the City of Peoria Police Department was on patrol in an unmarked police vehicle. He entered Peoria's River Front Park at about 2:45 a.m. and noticed a red Dodge Durango SUV parked at the back of a closed, dark parking lot. He decided to investigate. Lt. Barisch illuminated the vehicle with his headlights and then lit up the driver's side windows with a spotlight. Lt. Barisch exited his squad car and used his handheld flashlight to light up the darkly tinted rear passenger windows of the Durango.

Two individuals were observed in the rear passenger seats. As Lt. Barisch approached, he watched them make "sudden movements," one of which caught his attention: "the individual – the male behind the driver's seat [made] a quick, sudden movement leaning down and then toward the rear of the back driver's seat toward the floorboard, and then he quickly sat up." To Lt. Barisch, it looked like the man was

hiding something. As Lt. Barisch approached the Durango, the male started to open the rear passenger door and Lt. Barisch used his flashlight to illuminate the interior.

Inside sat Dazmine Erving and a female companion. Erving was semi-dressed; his companion was mostly dressed but her shirt was pulled upwards. Lt. Barisch assumed he had interrupted a couple attempting to engage in sexual relations. In addition to observing their state of undress, Lt. Barisch smelled a "lingering odor of burnt cannabis" but saw no other indicia of marijuana use. (A later search of the Durango turned up no other evidence of cannabis.)

Lt. Barisch asked the pair for identification. Erving provided his Illinois state ID card. The woman said her name was "Adriana Smith," born February 5, 2005. But she did not have identification. Lt. Barisch closed the door to the Durango and returned to his car to run their information. He discovered that Erving was serving a term of federal supervised release for a weapons offense, which began twelve days earlier on September 2, 2022. He also realized that the woman gave him false identifying information because a search for her name and birthdate returned no results, even though she indicated she had a driver's license.

When Lt. Barisch returned to the Durango, he asked whether Erving was on supervised release. Erving said that he was and gave Lt. Barisch the name of his probation officer. Lt. Barisch told the pair to step out of the vehicle and they complied. Erving asked if he could retrieve his shoes from the front seat. Lt. Barisch agreed and allowed the woman to retrieve her belongings too.

After allowing Erving and the female companion to get their belongings, Lt. Barisch directed the pair to the rear of the vehicle but did not handcuff them. Lt. Barisch poked his head into the Durango and looked under the driver's seat, which is where he thought Erving may have stashed something. He saw a gun but left it alone and radioed for backup. Once backup arrived, Lt. Barisch retrieved the gun. Erving was arrested, received *Miranda* warnings, and admitted the gun belonged to him.

**B. Procedural History**

On September 20, 2022, Erving was indicted for unlawfully possessing a weapon as a felon. 18 U.S.C. § 922(g)(1). The charge also resulted in a petition to revoke Erving's supervised release.[1]

*1. The Suppression Motion*

Erving moved to suppress the firearm, arguing that Lt. Barisch unlawfully searched the Durango by looking under the front seat. He contended the warrantless search of his car was not justified as a protective search. He also claimed that, because Illinois has legalized cannabis, the odor of burnt cannabis does not create probable cause to suspect a violation of state law.

---

[1] On February 20, 2020, Erving was indicted for unlawfully possessing a weapon as a felon in violation of 18 U.S.C. § 922(g)(1). For that offense, Erving pleaded guilty, and the district court sentenced him to serve 37 months in prison and three years' supervised release. One of the mandatory conditions of his supervised release was not committing another federal, state, or local crime. Based on his arrest for the instant offense, the Probation Office filed a petition to revoke Erving's supervised release.

In response, the government asserted that the search was a permissible protective search and that, in any case, the odor of cannabis gave Lt. Barisch probable cause to search for evidence of a violation of Illinois law. As for this latter argument, the government requested the district court take sides in a then-unresolved split among the Illinois appellate courts over whether the odor of cannabis creates probable cause.[2]

The district court denied Erving's motion after an evidentiary hearing. The court concluded Lt. Barisch permissibly performed a protective search. *See Michigan v. Long*, 463 U.S. 1032 (1983). In the court's view, Erving's furtive movements, his status as a person on supervised release for a weapons offense, and his companion's false statements made it reasonable to suspect that Erving was armed and dangerous and could access the gun. The court did not address whether the odor of cannabis creates probable cause of an Illinois crime.

2. *The Sentencing Hearing*

With respect to the new offense, Erving pleaded guilty to possessing the firearm unlawfully, though he preserved his right to appeal the court's suppression decision. As for the revocation petition in the separate criminal matter, Erving admitted to violating the conditions of his supervised release. The district court held the final hearing for Erving's revocation of supervised release with his scheduled sentencing hearing in the instant offense.

At the hearing, the parties agreed that Erving faced an advisory guidelines range of 33 to 41 months' imprisonment

_____

[2] The Supreme Court of Illinois has since ruled that the odor of burnt cannabis alone does not provide probable cause to conduct a warrantless search of a vehicle. *People v. Redmond*, 248 N.E.3d 1026, 1041 (Ill. 2024).

based on his criminal history category (VI) and total offense level (13). U.S.S.G §§ 2K2.1(a)(6)(A), 2K2.1(b)(4)(A), 3E1.1(a)–(b), 4A1.1(a)–(b), 4A1.2(k). The parties also agreed that Erving's supervised-release violation carried a term of 21 to 24 months' imprisonment.

The government asked the court to impose within-guidelines sentences for both offenses, with the terms to be served consecutively. The government argued Erving was a repeat offender whose latest offense came just a few days into his term of supervised release.

Erving sought a below-guidelines term of thirty months' imprisonment on the § 922(g) charge and asked to serve concurrently any revocation sentence. He argued his criminal history was overstated and that pending amendments to the United States Sentencing Guidelines would reduce his criminal history score, too. He also argued that there were significant factors in mitigation that pointed to a lower sentence, including that he voluntarily left behind a former gang affiliation at no small danger to himself and his family and that he was battling mental health issues. In allocution, Erving took responsibility for his actions, described growing up in a cycle of trauma, and maintained that he carried a gun only for self-defense.

In rendering the sentence, the district court began by accepting Erving's argument that pending amendments to the United States Sentencing Guidelines would reduce his criminal history points, and the court agreed to give him the benefit of those amendments. But that adjustment did not change Erving's criminal history category. To reduce his criminal history category, Erving also needed to demonstrate that his criminal history was overstated.

The court recognized Erving's argument that his criminal history was overstated but saw things differently:

> [Counsel] argues why the criminal history category is overstated and points to an obstruction, a contempt, and a mob action. And if those were ignored or set aside or excused, might change the Criminal History Category from VI to V.

> But I would likely say -- and I haven't reviewed the transcript of the previous sentencing, [counsel] -- that that argument was probably made by defense counsel at that time when Mr. Erving was sentenced to 37 months for a gun violation which ironically, the criminal history, the guideline range was the same then as it is now, 33 to 41 months.

> …

> But I would say, Mr. Erving, you're making it difficult for people to defend you and make these arguments by continuing to commit these same crimes.

After next addressing Erving's statements in allocution, the court imposed a 41-month sentence followed by a consecutive 24-month revocation sentence.

At the end of the hearing, the court offered "one last comment."

> I wanted to leave -- I don't mean this -- I wanted to leave your children out of this, but these decisions you're making are now making it so that more children are growing up without the

guidance of a father, but if you're going to make the choices you make, maybe that's better for them.

But having said that, clearly the last child that you made, the one born in January was made probably while you were in a halfway house. These are simply poor decisions, and they keep leading to more poor decisions.

And the gun you picked up here was within 12 days after you were put on supervised release.

So, I don't want to say that it points -- paints a picture of somebody who's just likely to continue to recidivate because I, frankly, think after listening to you now and listening to you a couple years ago you can figure out a way to move away from this. I hope you do so.

Erving timely appealed.

## II.  ANALYSIS

On appeal, Erving insists that the district court erred by denying his motion to suppress the firearm. He also contends that the district court erred at sentencing in two ways. First, by rejecting the arguments about his criminal history because he "probably" made those same argument before. Second, by penalizing him for having children. We address these arguments in turn.

### A.  The Protective Search

Erving argues that Lt. Barisch's warrantless search violated the Fourth Amendment and the district court erred by denying his suppression motion. "When reviewing a district

court's denial of a motion to suppress, we 'review the district court's legal conclusions de novo and its factual findings for clear error.'" *United States v. Walker*, 143 F.4th 889, 895 (7th Cir. 2025) (quoting *United States v. Williams*, 106 F.4th 639, 653 (7th Cir. 2024)). Within the realm of fact-finding, we give special deference to the district court's credibility determinations unless "we are 'left with the definite and firm conviction that a mistake has been made.'" *United States v. Olson*, 41 F.4th 792, 802 (7th Cir. 2022) (quoting *United States v. Wendt*, 465 F.3d 814, 816 (7th Cir. 2006)).

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. CONST. amend. IV. This constitutional protection means the government usually must obtain a warrant before conducting a search or seizure. *Arizona v. Gant*, 556 U.S. 332, 338 (2009). Indeed, warrantless searches are "*per se* unreasonable" unless one of the "few specifically established and well-delineated exceptions" to the warrant requirement applies. *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

Among these is the protective search exception. *See Terry v. Ohio*, 392 U.S. 1, 20–27 (1968); *Long*, 463 U.S. at 1045–52. *Terry* marks the genesis of this exception. 392 U.S. at 20–27. There the Supreme Court held that for "officers to protect themselves and other[s]," the Fourth Amendment allows them to conduct a search of a person, often referred to as a "frisk" or "pat down," where they "point to specific and articulable facts" indicating "that criminal activity may be afoot and that the persons with whom [they are] dealing may be armed and presently dangerous." *Id.* at 21, 24–25, 30.

Protective searches, though, are not necessarily limited to a brief search of an individual's person. Consistent with the

Fourth Amendment, an officer may also conduct "area searches" for weapons "in limited circumstances." *United States v. Richmond*, 924 F.3d 404, 413–14 (7th Cir. 2019) (citation omitted).

Relevant here, an officer armed with a "reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons," may "conduct[] a legitimate *Terry* search of the interior of [an] automobile." *Long*, 463 U.S. at 1049–50 (quoting *Terry*, 392 U.S. at 21). Still, such a search "must be strictly limited to that which is necessary for the discovery of weapons," *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (internal quotation mark and citation omitted), and confined to "those areas in which a weapon may be placed or hidden" within the car, *Long*, 463 U.S. at 1049. Thus, a protective search of a vehicle is permissible if officers have reasonable suspicion to believe: (1) "the suspect is dangerous" and (2) the suspect "may gain immediate control of weapons." *Id.*; *see also United States v. Vaccaro*, 915 F.3d 431, 436–37 (7th Cir. 2019); *United States v. Arnold*, 388 F.3d 237, 239 (7th Cir. 2004); *United States v. Wimbush*, 337 F.3d 947, 950 (7th Cir. 2003).

*1. Dangerousness*

To meet the first criterion, Lt. Barisch needed reasonable suspicion to believe that Erving was dangerous. *Long*, 463 U.S. at 1049. Reasonable suspicion rests on particularized facts and requires "more than a hunch but less than probable cause." *Richmond*, 924 F.3d at 411. Put another way, determinations of reasonable suspicion "must be based on commonsense judgments and inferences about human behavior." *Illinois v.*

*Wardlow*, 528 U.S. 119, 125 (2000) (citation omitted). And to resolve this question, we conduct an objective inquiry, considering the totality of the circumstances. *Richmond*, 924 F.3d at 411.

When evaluating whether a stop is objectively dangerous, context matters. *See United States v. Ford*, 872 F.3d 412, 416 (7th Cir. 2017). The stop here was conducted by a lone officer at 2:45 a.m., in a park known for its propensity to host vice and narcotics-related crime. Stops that occur in the dead of night in "area[s] where crime is not a stranger" are generally "more fraught with potential danger to an officer than would be a stop during the light of day." *Id.* (quoting *United States v. Brown*, 273 F.3d 747, 748 (7th Cir. 2001)). That's a fair description of the scenario that Lt. Barisch encountered in River Front Park. The increased potential for danger in a secluded, crime-prone location colors what happened next. *Cf. Vaccaro*, 915 F.3d at 436.

As Lt. Barisch approached the Durango to investigate, he saw Erving move in a manner consistent with hiding something, not with getting dressed quickly. We have long held that a suspect's furtive movements matter to the reasonable suspicion analysis. *E.g.*, *Vaccaro*, 915 F.3d at 434, 436 (recounting that the suspect "aggressive[ly] move[d] … his entire top torso and both arms into the back seat of the vehicle"); *Arnold*, 388 F.3d at 238 (noting the suspect "wormed his way" into the back seat after being stopped, apparently hid something, and then returned to the front seat).

Rather than contest Lt. Barisch's testimony (which the court expressly found credible), Erving makes two general arguments. First, he contends the phrase "furtive movement" is not a magic incantation that permits police to justify a vehicle

search at every traffic stop. *Cf. Long*, 463 U.S. at 1049 n.14 (emphasizing that every protective search must be justified on its own terms and there is no blanket right to search a vehicle). We agree in principle, but this is not a magic words case. Lt. Barisch explained the movements he saw were "not associate[d] with getting dressed." Rather, as he approached the car, he observed Erving make "a deliberate, sudden, quick movement leaning down and then quickly back up." Lt. Barisch then explained why this was suspicious: "the movements of trying to get dressed would have been significantly longer and different …. [M]ore of an up-and-leaning-back movement." In short, "furtive movements" is shorthand for Lt. Barisch's assessment that Erving was trying to hide something, not to regain his composure.

Second, Erving argues that even if his movements were vaguely suspicious, the obvious, innocuous explanation for his movements—getting dressed after being caught during a back seat escapade—means his movements alone do not suggest objective dangerousness. We agree reasonable suspicion does not arise from acts that are "consistent" with lawful behavior rather than illegal activity. *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1014 (7th Cir. 2016). But the presence of "an innocent explanation" for suspicious behavior alone does not dispel reasonable suspicion because "absolute[] certain[ty]" of criminality is not required for a protective search. *Vaccaro*, 915 F.3d at 436. And, as already explained, Lt. Barisch reasonably ruled out the purported innocent explanation for the movements Erving now presses before us.

Even if Erving's surreptitious actions alone did not create reasonable suspicion that Erving was dangerous, we cannot miss the forest for the trees. After observing Erving move

furtively in a vehicle parked at the back of a closed parking lot at nearly 3 a.m., he opened the door as Lt. Barisch approached the Durango's rear passenger door. The odor of burnt cannabis emanated from the vehicle. This, too, contributed to reasonable suspicion. Reason to believe a suspect may be "under the influence of drugs," including the mere smell of intoxicants, contributes to reasonable suspicion. *Vaccaro*, 915 F.3d at 436–37; *Ford*, 872 F.3d at 415–16. We have little trouble concluding that the odor of burnt cannabis contributed to reasonable suspicion for a protective search here.[3] It is reasonable to suspect that someone who is under the influence of intoxicants is more likely to pose a danger to others. *United States v. Colbert*, 54 F.4th 521, 528 (7th Cir. 2022).

Yet, even after all this, Lt. Barisch did not conduct a protective search immediately. Instead, he waited until after he learned about Erving's criminal history and the fact that Erving was presently on supervised release for a weapons offense. That adds important context because we have repeatedly held that knowledge of prior criminal activity can "contribute to reasonable suspicion." *Vaccaro*, 915 F.3d at 437.

We see this as a case where the whole is greater than the sum of its parts. Only once Lt. Barisch knew that he was alone in a dark parking lot in the dead of night, had smelled burnt

---

[3] Lt. Barisch testified that he smelled burnt cannabis, and the district court credited this testimony. Erving seems to contest that finding, arguing that there is no way to verify whether an officer has, in fact, detected an odor of burnt cannabis. Maybe so. But it is the district court's prerogative to sort through witness testimony, even if uncorroborated, and decide who to believe. *United States v. Biggs*, 491 F.3d 616, 621–22 (7th Cir. 2007). We see no reason to think the district court clearly erred in accepting Lt. Barisch's account of what he smelled. *See Olson*, 41 F.4th at 802.

cannabis, learned one of the individuals provided him with false identifying information, and realized that he was dealing with a convicted felon who had apparently hidden something did Lt. Barisch conduct a search for weapons. At that point, Lt. Barisch had reasonable suspicion that Erving was dangerous.

### 2.  *Immediate Control of a Weapon*

The second *Long* criterion—ability to gain immediate control of a weapon—can be satisfied if the suspect is likely to be released, or permitted to gather belongings from the vehicle. *Vaccaro*, 915 F.3d at 437–38.

The parties agree that Erving committed no arrestable offense before Lt. Barisch discovered the weapon, so Erving was likely to be released. Thus, under *Vaccaro*, Erving "was not under arrest [and] could have regained access to his vehicle," so the second prerequisite for a protective search is met. *Id.* (citations omitted). Erving concedes the second *Long* criterion is satisfied given our decision in *Vaccaro*. Erving argues *Vaccaro* was wrongly decided and asks us to overrule it.

We decline the invitation. *Vaccaro* is not Erving's real obstacle—*Long* is. The Supreme Court held that a protective search is permitted "if the suspect is not placed under arrest" and will be allowed to return to the vehicle. *Long*, 463 U.S. at 1051–52. In other words, *Vaccaro* applied binding precedent and forecloses Erving's argument. 915 F.3d at 436–38.

### 3.  *Erving's Fallback Position*

Relying on *United States v. Rodgers*, 924 F.2d 219 (11th Cir. 1991), Erving's last argument is that *Long* does not apply because Lt. Barisch did not act concerned for his own safety prior to searching the Durango. If Lt. Barisch was not *really*

concerned for his safety, the argument goes, then *Long* cannot apply because *Long* is about officer safety. *See Vaccaro*, 915 F.3d at 436.

In *Rodgers*, an officer entered a mobile-home trailer without a warrant "for the purpose of seizing contraband," seized the contraband, and then left. 924 F.2d at 222. The Eleventh Circuit concluded that there were no "specific and articulable facts" that the area searched "harbored an individual posing a danger to the officer or others," in part because the officer did not search anywhere else in the trailer. *Id.* (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)). Given the targeted nature of the search and the lack of any reason to suspect that a dangerous person could access the trailer, the Eleventh Circuit concluded that the government was trying to shoehorn a warrantless search of a home into the protective sweep exception. *Id.*

Erving maintains that because Lt. Barisch let Erving remain in the Durango while he ran Erving's information, let Erving retrieve belongings from the vehicle, did not handcuff Erving until backup arrived, and searched only under the driver's seat—rather than conducting a full protective search of the vehicle or physically restraining either Erving or the female passenger—it shows Lt. Barisch was not concerned for officer safety, and thus not permitted to conduct a protective search.

This argument fails to persuade for numerous reasons. Fundamentally, our inquiry under the Fourth Amendment is objective; we are generally unconcerned with officers' subjective motivations. *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006). As such, unusually calm or brave officers can conduct protective searches. Also, a quick, tailored search is less

intrusive on a person's interests than a longer one. *See Terry*, 392 U.S. at 10–12, 20–21. By limiting a search to the area that prompted concern in the first place, officers promote the purpose of the protective search—ensuring safety—while respecting the constitutional rights and dignitary interests of the person searched. Here, Lt. Barisch had reasonable suspicion to believe there was a weapon hidden beneath the driver's seat and he conducted a targeted search to confirm or dispel that suspicion. *See Wardlow*, 528 U.S. at 123.

*        *        *

In sum, we conclude the district court rightly denied Erving's motion to suppress the evidence obtained from Lt. Barisch's search of Erving's vehicle. The search was justified by the protective search exception to the Fourth Amendment's warrant requirement.[4]

**B.  Sentencing**

Erving contends that the district court committed reversible procedural and constitutional error at sentencing. We review these claims de novo. *United States v. Shaw*, 39 F.4th 450, 455 (7th Cir. 2022). Though Erving never objected to either error during the sentencing hearing, he was not given a chance to object and did not have to take exception afterwards. *See United States v. Wilcher*, 91 F.4th 864, 871 (7th Cir. 2024).

This appeal implicates several principles of proper sentencing procedure. District "[c]ourts must 'adequately explain' the sentences they hand down," *id.* (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)), and address the

---

[4] Accordingly, we need not resolve the parties' dispute over whether the automobile exception applies.

defendant's principal arguments in mitigation, *United States v. Williams*, 887 F.3d 326, 328 (7th Cir. 2018). Separately, defendants have a due process right to be sentenced based on accurate, reliable information. *United States v. Oliver*, 873 F.3d 601, 608–09 (7th Cir. 2017); *United States v. Helding*, 948 F.3d 864, 870 (7th Cir. 2020). A corollary of that right is the prohibition on sentencing defendants based on speculation. *United States v. Newton*, 76 F.4th 662, 674 (7th Cir. 2023).

When it comes to reviewing claims of procedural or constitutional error, we review the record "fairly and as a whole." *United States v. Coe*, 992 F.3d 594, 598 (7th Cir. 2021). When reviewing a sentencing transcript, we read the court's remarks in context, not in isolation. *United States v. Gary*, 613 F.3d 706, 709–10 (7th Cir. 2010).

### 1.  The Alleged Procedural Error

Erving first argues the district court procedurally erred by rejecting his "primary" mitigation argument that his criminal history was overstated. Specifically, he argued to the court that his prior convictions for obstruction, contempt, and a mob action exaggerated his criminal history.

But the court concluded otherwise. It focused on Erving's recidivism, remarking that by "continuing to commit these same crimes," he made "it difficult for people to defend" him. Indeed, he committed the offense within "12 days after [he] [was] put on supervised release" for a conviction of the same offense. In rejecting Erving's request, the court also remarked that his arguments "[were] probably made by defense counsel" before at Erving's prior sentencing for "a gun violation." On appeal, Erving contends this statement shows the district court improperly speculated in rejecting his argument.

We disagree. When fairly reviewed in context and as a whole, the court did not reject Erving's arguments regarding his criminal history because they were "probably made" before. From the record, it is clear the court determined Erving was a repeat offender who engaged in the same criminal behavior—possession of a firearm by convicted felon—even while on supervised release for a similar weapons conviction. Thus, we find the district court appropriately considered Erving's mitigation argument and did not rely on speculation in imposing Erving's sentence. *See United States v. Donelli*, 747 F.3d 936, 939–40 (7th Cir. 2014); *United States v. Nelson*, 774 F.3d 1104, 1107 (7th Cir. 2014) (per curiam).[5]

### 2. *The Alleged Constitutional Error*

Next, Erving asserts the district court committed constitutional error at sentencing for penalizing his decision to bear and raise children, a fundamental right. *E.g.*, *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

Only constitutionally permissible factors may be used to determine a sentence. *Pepper v. United States*, 562 U.S. 476, 489 n.8 (2011). A wide swath of information falls into that category. But not everything. For example, a court cannot

---

[5] At oral argument, Erving claimed the district court did not adequately address several other of Erving's primary arguments in mitigation, including his mental health struggles and difficult, voluntary withdrawal from a street gang. Because Erving omitted these arguments from his brief and did not meaningfully press these alleged errors until oral argument, we conclude he has waived them. *Tuduj v. Newbold*, 958 F.3d 576, 579 (7th Cir. 2020) (per curiam) ("[A]rguments not raised in an opening brief are waived."(citation omitted)).

sentence a person based in part on race or gender; those considerations are constitutionally out-of-bounds. *Oliver v. United States*, 951 F.3d 841, 844 (7th Cir. 2020); *United States v. Trujillo-Castillon*, 692 F.3d 575, 579 (7th Cir. 2012). The United States Sentencing Guidelines, too, provide that "race, sex, national origin, creed, religion, and socio-economic status" are off the table at sentencing. *Trujillo-Castillon*, 692 F.3d at 579 (citing U.S.S.G. § 5H1.10).

Erving points to these comments, which the court made at the end of his sentencing hearing, in support of his argument that the court committed constitutional error:

> [T]hese decisions you're making are now making it so that more children are growing up without the guidance of a father, but if you're going to make the choices you make, maybe that's better for them. … [C]learly the last child that you made, the one born in January was made probably while you were in a halfway house. These are simply poor decisions, and they keep leading to more poor decisions.

These comments, Erving contends, show that the court improperly punished him for exercising his fundamental constitutional right to bear and raise children. Erving maintains the court's comments "poison the judgment" because they show that the court relied on a constitutionally impermissible factor in imposing sentence.

The Supreme Court has long recognized a constitutional right to familial relations, *e.g.*, *Moore v. City of East Cleveland*, 431 U.S. 494, 499 (1977), including the right to "establish a home and bring up children," *Meyer*, 262 U.S. at 399. Indeed,

we have recognized the right "to bear and raise … children is the most fundamental of all rights—the foundation of not just this country, but of all civilization." *Brokaw v. Mercer County*, 235 F.3d 1000, 1018 (7th Cir. 2000) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972)).

We reject the idea that courts may penalize defendants for exercising their fundamental constitutional rights.[6] But there is a world of difference between pointing out the harm that a defendant inflicts on his family by committing crimes and punishing a person for choosing to have children in the first place. When defendants invoke their family responsibilities as a reason for a lesser sentence, the district court is permitted to engage with the argument. This may include the district court reminding the defendant that his actions create hardship for his family, or even, in "truly extraordinary" cases, the

---

[6] The Supreme Court has repeatedly rejected such arguments. *E.g.*, *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort."); *Mitchell v. United States*, 526 U.S. 314, 328–29 (1999) (holding that courts cannot draw adverse inference at sentencing from a defendant's choice to exercise his right to remain silent); *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969) (holding that courts cannot increase a sentence because of a successful appeal), *overruled in part on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989). So too have the courts of appeals. *E.g.*, *United States v. Peskin*, 527 F.2d 71, 87 (7th Cir. 1975) ("A sentence which reflects punishment for a defendant's availing himself of his right to trial will be set aside."); *United States v. Singletary*, 75 F.4th 416, 422 (4th Cir. 2023) (concluding that an appellate waiver in a plea agreement will be set aside if "the sentencing court violated a fundamental constitutional … right" (quoting *United States v. Archie*, 771 F.3d 217, 223 (4th Cir. 2014)); *United States v. Barahona-Montenegro*, 565 F.3d 980, 985 (6th Cir. 2009) (reversing sentence imposed in part because of "irrelevant factors" like having fathered five children out of wedlock).

district court identifying family ties as a reason to impose a lesser sentence. *United States v. Reed*, 859 F.3d 468, 473 (7th Cir. 2017). But these permissible responses are far afield of incarcerating someone because of or based in part on their decision to bear and raise children.

We do not condone the district court's insinuation that Erving's children are better off without him. Nor do we approve of the suggestion that Erving's decision to have children was a "poor decision" on par with illegally possessing weapons.

Even so, we do not think that the district court's unfortunate comments reflect a decision to punish Erving more harshly for bearing children. The comments came after the court had imposed sentence. At that point, the court had already announced its chosen sentence after it completed its analysis of the United States Sentencing Guidelines, the 18 U.S.C. § 3553(a) factors, and the parties' arguments. There is no indication in the transcript that the court relied on Erving's childbearing choices in choosing a sentence or that the comments reveal a previously unannounced sentencing rationale. *See Coe*, 992 F.3d at 598 (requiring a showing of reliance on the impermissible statement); *Trujillo-Castillon*, 692 F.3d at 579 (same). The court's "one last comment," in other words, strikes us as a poorly worded personal entreaty to Erving, not an explanation for the court's sentencing decision.

## III.  Conclusion

For these reasons, we Affirm the denial of Erving's suppression motion and the court's sentencing decision.